NO.  94-047

IN THE SUPREME COURT OF THE STATE OF MONTANA

1994

IN THE MATTER OF G.J.P., III

    Respondent and Appellant.


APPEAL FROM:  District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone,
The Honorable Maurice R. Colberg, Jr., Judge
presiding.


COUNSEL OF RECORD:

    For Appellant:

    Terry L. Seiffert, Billings, Montana

    For Respondent:

    Honorable Joseph P. Mazurek, Attorney General;
Carol Schmidt, Assistant Attorney General, Helena,
Montana

    Dennis J. Paxinos, Yellowstone County Attorney,
Billings, Montana

Submitted on Briefs:  July 7, 1994

Decided:  September 12, 1994

Filed:

FILED

SEP 12 1994

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

Cl&k

Chief Justice J. A. Turnage delivered the Opinion of the Court.

G.J.P., III (G.P.), was involuntarily committedtothe Montana State Hospital in August 1993. He appeals from the order of commitment entered by the District Court for the Thirteenth Judicial District, Yellowstone County. We affirm.

The issues are:

1. Was G.P. illegally detained under § 53-21-129, MCA?

2. Were G.P.'s procedural and constitutional rights otherwise violated, mandating reversal of his commitment?

3. Did the District Court err in failing to rule on the petition for conservatorship?

On August 11, 1993, Dr. David Carlson, a Billings, Montana, psychiatrist, contacted the Yellowstone County Attorney's Office and the Billings Police Department requesting an emergency detention of G.P. pursuant to § 53-21-129, MCA. G.P., who was an attorney, was detained and placed in the psychiatric unit at Deaconess Hospital.

The next day, at the request of Dr. Carlson and Phillip Oliver, a self-described friend of G.P., the Yellowstone County Attorney's Office filed a petition asking that G.P. be involuntarily committed as a seriously mentally ill person. In his written request for commitment, Oliver stated:

> I have known [G.P.] for approximately six years. Approximately four years ago he called upon my help to aid him in his drinking problem. . . . [A]fter several months [G.P.] resumed drinking and I had little contact with him.

2

. . .

In November, 1991, after [G.P.] had been charged with
domestic abuse . . . he contacted me indicating that he
was thinking of killing himself. He was asking for help
and I suggested that he be committed to Deaconess Medical
Center. . . . That day [G.P.] was [voluntarily] admitted
to Deaconess Medical Center where he spent approximately
4 or 5 days before being transferred to the VA Hospital
in Sheridan, Wyoming for alcohol treatment. He was
released on Christmas Eve of 1991 to the best of my
knowledge.

. . .

. . . [I]n the spring of 1993, [G.P.] visited my office
indicating that he had started drinking again, that he
had another problem with domestic abuse and with the
police and had been involuntarily committed to Deaconess.
. . .

Subsequent to that time my partners and I have received
various phone calls from potential clients and other
attorneys regarding [G.P.]. Several of these people have
questioned whether [G.P.] would perhaps kill himself.
. . .

I received calls from Judge Stewart, of City Court, and
Judge Fillner, 13th Judicial Court Judge, regarding
[G.P.]'s erratic behavior in court and his inability to
represent clients in an effective and logical manner.
The phone calls have all been this week. In addition, I
have'talked to several local attorneys who have expressed
concern about [G.P.]'s potential danger to himself and to
others. . . .

In all of my many conversations with [G.P.], I have
noted in the past his discussions about doing harm to
others and to himself and what his mental state was at
that time. While he has not told me directly that he
wishes to harm himself or others recently, I noted in my
discussions with him, that he is of the same frame of
mind today and has the same attitude and exhibits the
same characteristics as during those times when I heard
him say that he was going to do himself in.

In his written request for commitment, Dr. Carlson stated

there was an immediate need to detain and hospitalize G.P. because

3

of "no insight, very agitated, suicide rife." He further stated G.P. had a "history of depression with suicide ideation & behavior." Dr. Carlson said he had received multiple calls regarding G.P.'s behavior and risk of suicide, and, since his hospitalization the day before, G.P. had been "uncooperative & very psychotic."

At the initial hearing on August 13, 1993, the court advised G.P. of his rights and appointed counsel, a "next friend," and a professional person pursuant to § 53-21-122(2), MCA. The court appointed Dr. Carlson as the professional person and stated its willingness to appoint a second professional person, to be selected by G.P.

G.P. asked that he be released, arguing there was no probable cause for his emergency detention. He testified that, during the day he had been hospitalized, he had demonstrated "in many, many ways" that if he were a danger to himself or others he could have "hung myself or inflicted bodily harm upon myself or on other individuals there." He also gave a lengthy, rambling monologue about his plans to travel to Arkansas to go fishing with his former boss: to speak to the national governors' conference in Tulsa, Oklahoma, about his proposed charitable organization, which would pay the national debt through citizen contributions into a stovepipe hat; to make a trip to Washington, D.C., to meet with President and Mrs. Clinton; and to be present for his daughter's eighteenth birthday in Arkansas. The State asked that G.P.'s hospitalization be continued until the commitment hearing. The

4

court granted that request, basing its ruling on the documents attached to the petition and on G.P.'s own testimony.

A hearing on the petition for involuntary commitment was held on August 18, 1993. The court heard testimony by several friends of G.P., by Dr. Carlson, and by G.P. himself. At G.P.'s request, the court also viewed writings which G.P. had drafted in magic marker on the walls of his hospital room. G.P. explained the writings, some of which he stated were in code, at length. G.P. chose not to present testimony by a second professional person. At the end of the hearing, the court ordered that G.P. be committed to the Montana State Hospital for a period of up to three months.

## Issue 1

Was G.P. illegally detained under § 53-21-129, MCA?

Section 53-21-129, MCA, provides:

Emergency situation -- petition -- detention. (1) When an emergency situation exists, a peace officer may take any person who appears to be seriously mentally ill and as a result of serious mental illness to be a danger to others or to himself into custody only for sufficient time to contact a professional person for emergency evaluation. If possible, a professional person should be called prior to taking the person into custody.

(2) If the professional person agrees that the person detained appears to be seriously mentally ill and that an emergency situation exists, then the person may be detained and treated until the next regular business day. At that time, the professional person shall release the detained person or file his findings with the county attorney who, if he determines probable cause to exist, shall file the petition provided for in 53-21-121 through 53-21-126 in the county of the respondent's residence. In either case, the professional person shall file a report with the court explaining his actions.

5

G.P. maintains no emergency situation existed when he was first detained, because he had not at that time exhibited any overt acts, threats, or violence of any sort. He cites Matter of Shennum (1984), 210 Mont. 442, 684 P.2d 1073.

In Shennum, Alan Shennum, armed with a loaded semiautomatic pistol, seated himself in the public section of the chambers of the Missoula City Council just before a scheduled Council meeting. After he was discovered, apprehended, questioned, and relieved of his weapon by local police, he was released. The next morning, Shennum went to the police station to pick up his gun. He was detained there and examined by a Missoula psychiatrist. Later that day, he was transferred to the mental health unit of a local hospital. A petition for commitment in the state mental hospital was filed the following day.

This Court held that the record did not demonstrate a finding by the psychiatrist of an emergency situation justifying Shennum's detainment at the police station, and reversed his commitment. Shennum, 684 P.2d at 1077. Noting that it was not clear whether Shennum was still hospitalized when the opinion was issued, this Court ordered that, if he was, his release should be pursued "with all deliberate speed." Shennum, 684 P.2d at 1080.

The facts in Shennum differ from those in the present case in important respects. Shennum was originally detained under § 53-21-129(1), MCA, without the recommendation of a professional person. Unlike Shennum, G.P. was detained at the request of a professional

6

person, Dr. Carlson. Under § 53-21-129(2), MCA, the determination of whether a person appears to be seriously mentally ill and an emergency situation exists is left to the professional person, whose request for emergency detainment is sufficient for detainment until the next business day.

The dissent expresses concern about the propriety of Dr. Carlson's determinations that G.P. was seriously mentally ill and that an emergency situation existed. However, under § 53-21-129(2), MCA, the professional person's request for emergency detainment is sufficient for detainment until the next business day. The concerns expressed by the dissent might properly be raised in an action against the professional person, but not in an action challenging a commitment, such as this action.

Dr. Carlson testified at the hearing on August 18 that he treated G.P. during and following his hospitalization three months earlier. He said G.P. suffered from manic depressiveness, a cyclical illness in which, after individuals have a "high" which is not treated, they will "crash" into a severe depression. He further testified that, in the days before he requested G.P.'s emergency detainment, he had received many phone calls from persons concerned about G.P.'s mental health, including another therapist treating G.P. He stated that, at G.P.'s insistence, he met with G.P. in a parking lot on August 10 so that G.P. could give him copies of press releases relating to his charitable organization. G.P. agreed to an appointment at Dr. Carlson's office the following

7

day. Dr. Carlson testified that G.P.'s history indicated that he would become severely depressed when he "crashed" from his manic high. Dr. Carlson was aware of all this before he filed the original request for G.P.'s emergency detainment. G.P.'s claim that there was no basis for Dr. Carlson to request his emergency detainment is disproved by the record.

Further, at the time he filed his notice of appeal, G.P. was no longer detained as a result of this proceeding. The remedy provided in Shennum is therefore inapplicable.

On August 12, the next business day following G.P.'s initial detainment, the county attorney filed a petition for commitment. The requirements of § 53-21-129(2), MCA, were thus met. We point out that the judgment of the county attorney and of the district court are built-in checks upon the discretion of a professional personal to restrain a person under § 53-21-129(2), MCA, for more than one day.

G.P. also contends his objection to his continued detainment, made at his initial appearance before the court, should have been granted. In its order continuing G.P.'s detainment, the District Court stated that, based on the documents attached to the petition for involuntary commitment and on G.P.'s own testimony at the initial hearing, it found probable cause to detain him for his own safety pending the commitment hearing five days later. After reviewing the record, including G.P.'s own testimony, we conclude the court did not err in so ruling.

8

Issue 2

Were G.P.'s procedural and constitutional rights otherwise violated, mandating reversal of his commitment?

G.P. groups a number of claims under this issue. We first address his argument that Phillip Oliver did not have the requisite direct knowledge of the facts to make a request for commitment with the county attorney pursuant to § 53-21-121, MCA.

Oliver admitted on cross-examination that he did not have personal knowledge of any present threats or suicidal gestures on the part of G.P. However, in his petition for commitment, he stated he had personal knowledge that G.P. was "of the same frame of mind today and has the same attitude and exhibits the same characteristics as during those times [in the past] when I heard him say that he was going to do himself in." Oliver's overall knowledge of the facts concerning G.P.'s history and illness was demonstrated in his testimony and request for involuntary commitment. We conclude he had sufficient personal knowledge of the facts to make a joint request for commitment, along with Dr. Carlson, to the county attorney.

G.P. next claims his evaluation by Dr. Carlson pursuant to § 53-21-129(2), MCA, improperly occurred prior to his initial appearance before the District Court, instead of after the hearing and after he was advised of his rights. He states the evaluation was completed prior to the court granting Dr. Carlson the authority to conduct the evaluation. Citing § 53-21-141(1), MCA, he also

9

complains that Dr. Carlson did not advise him that the interview was to be used for the evaluation and not for treatment.

The court accepted into evidence two letters written by Dr. Carlson. The first was written on August 12, the day before G.P.'s initial hearing. This is the letter of which G.P. here complains. However, G.P. has identified nothing in Dr. Carlson's August 12 letter which refers to privileged communication with G.P.

Dr. Carlson testified on August 18 that he tried to talk with G.P. on at least five different occasions during G.P.'s hospitalization, but that G.P. was either too aggressive or not "rousable" from sleep on most of those occasions. "We really felt that there was very little accomplished by a subsequent interview, and we would just let him sleep so we would not have to medicate him further, put him in restraints."

Dr. Carlson's letter of August 17, 1993, which was the second letter introduced into evidence, is germane to many of G.P.'s other complaints concerning his treatment. This letter was written after G.P.'s initial hearing and after G.P. was fully advised of his rights.

G.P. claims he was "continually detained in seclusion and in isolation as well as maintained in restraints" in violation of § 53-21-146, MCA. He alleges that he was denied medical care for broken ribs in violation of § 53-21-142(11), MCA; denied the right of telephone communication in violation of § 53-21-142(3), MCA; and

10

administered medication within twenty-four hours before the hearing, despite his objection, in violation of § 53-21-115, MCA.

In his August 17 letter, Dr. Carlson stated:

> [G.P.] has continued to demonstrate extremely severe symptoms of mental illness. In fact, if anything, [G.P.]'s illness has worsened considerably over the last few days.
>
> [G.P.] has remained on the closed unit at the Psychiatric Center. He has spent the majority of his time being secluded to his room because of his severely manic behaviors. . . . [G.P.] has been extremely destructive of hospital property. This includes an episode shortly after admission where he wrote at great lengths with magic marker filling one of the walls of his hospital room with rambling, grandiose and delusional content. . . . On the morning of 8/12 he had a noose hanging from an air screen in his hospital room. He, the following day, hung a bed sheet from this noose claiming that it was an effigy but did not identify who this was supposed to be. . . . We have had to limit his telephone calls because of complaints of acquaintances about the inappropriateness of his calls, both in terms of time of day as well as duration and content.
>
> On 8/14 [G.P.] became very agitated on the telephone. He began banging the telephone on a counter and then began indiscriminately waving the telephone around[.] . . . When staff attempted to intervene, he managed to get one of the nurses in a head lock, injuring his neck. He then proceeded to kick at and kick another employee. He has attempted to bite employees. He has spit on employees and thrown urine in urinals at employees. [G.P.] is well aware of his HIV status[.] . . .
>
> [G.P.] has essentially been in restraints about 90% of the time since last Saturday's incident. During attempts to take him out of restraints, although he is initially agreeable and calm, he rapidly becomes very agitated and assaultive again to staff. [G.P.] has removed himself from restraints on three occasions including an episode today where he cut himself out of restraints using a piece of metal again obtained by tearing up his mattress.
>
> [G.P.] has completely refused treatment at our hospital. . . . He has been ordered medication against

11

his will because of his obviously dangerous behaviors. This medication has had to be administered intramuscularly in almost every occasion.

**[G.P.]** shows no insight into his illness. He is unwilling to take Lithium. . . . When he is not sedated, he is almost unmanageable at its occlusion.

. . .

[G.P.] is truly a very ill individual. He has severe characterologic symptoms, but at this time he is obviously very manic and **quite** unable to care for himself and his affairs. . . . He has made it almost impossible to provide him with care in this setting. To that end, I think **[G.P]'s** prognosis is generally very poor, but he is deserving of the effort to provide him with treatment.

The right to be free from physical restraint and isolation under § 53-21-146, MCA, is not absolute. It exists "except for emergency situations." Dr. **Carlson's** letter explains generally the use of isolation and restraints to control **G.P.'s** violent and aggressive behavior toward hospital staff and patients. In his allegations, G.P. has not identified any specific instance in which he was restrained or isolated in violation of his rights.

Dr. **Carlson** testified that G.P. was not amenable to being transported to the X-ray room of the hospital to have his ribs X-rayed. Dr. **Carlson** further testified that the hospital does not provide medical treatment for broken ribs other than X-raying them to determine whether they are indeed broken.

Patients admitted to a mental health facility have the right to **"reasonable"** access to telephone communications. Section 53-21-142(3), MCA. G.P. has not established that he was denied this right. Dr. **Carlson** testified that G.P. was not denied all

12

telephone access. He was limited as to time and number of phone calls, so that he could make no calls after midnight and other patients could also use the phone.

Patients involuntarily detained for serious mental illness have a right to be free from "any but lifesaving medication" for up to twenty-four hours prior to a hearing. Section 53-21-115, MCA. Dr. Carlson testified that he determined G.P.'s behavior was so agitated that he was a risk to himself and a threat to the safety of others. The District Court found that the medication given to G.P. prior to the hearing was lifesaving. We conclude that finding is supported by substantial credible evidence.

None of the rights claimed by G.P. are absolute. G.P. has not demonstrated any restrictions on his rights other than those necessary for his treatment, evaluation, and care. Further, G.P. has not established that reversal of his commitment would be a proper remedy for any such denial or restriction of his rights. After reviewing the record, we conclude that G.P. has not established that his commitment should be reversed due to violations of his procedural and constitutional rights.

Issue 3

Did the District Court err in failing to rule on the petition for conservatorship?

On August 26, 1993, G.P., through his counsel, filed a petition asking the District Court, in the alternative, to (1) direct his counsel how to proceed to protect G.P.'s assets,

practice, and clients, or (2) appoint a conservator of G.P.'s estate, or (3) enter "such other appropriate orders for the protection of [G.P.]'s assets and for the protection of [G.P.]'s clients." In response to this request, the court entered an order on September 3, 1993, authorizing G.P.'s counsel to secure G.P.'s mail. G.P. was apparently discharged from the Montana State Hospital on September 15, 1993.

G.P. argues that the court's "failure to rule on" his August 26 motion left his clients in a state of limbo of not having an attorney to meet their legal needs. However, he has not described any specific problems incurred by any of his clients. Furthermore, his motion was set forth in the alternative. The court granted relief in the form of authorizing G.P.'s counsel to secure G.P.'s mail. The allegation that there was a "failure to rule" on the motion on the part of the District Court is simply not true. Suggestions for procedures to handle the caseloads of attorneys who become suddenly unavailable to their clients due to mental illness or other reasons might better be raised in another manner or to another forum, such as the State Bar of Montana. We hold that the District Court did not err as alleged under Issue 3.

We affirm the order of commitment entered by the District Court.

_____
Chief Justice

14

We concur :

_John Conway Harrison_

_Tom Trieweiler_

_____

_____
Justices

Justice **Karla** M. Gray, dissenting.

I respectfully dissent from the Court's opinion on the issue of whether G.P. was illegally detained under § 53-21-129, MCA. When controlling statutes are applied, it is clear that the Court's conclusion that G.P. was not illegally detained is incorrect.

G.P. originally was detained pursuant to § 53-21-129, MCA, which provides for the extraordinary procedure of civilly detaining a Montana citizen prior to any judicial involvement. The statute provides in pertinent part:

> Emergency situation -- petition -- detention.
> (1) When an emergency situation exists, a peace officer may take any person who appears to be seriously mentally ill and as a result of serious mental illness to be a danger to others or to himself into custody only for sufficient time to contact a professional person for emergency evaluation. If possible, a professional person should be called prior to taking the person into custody.
> (2) If the professional person agrees that the person detained appears to be seriously mentally ill and that an emergency situation exists, then the person may be detained and treated until the next regular business day.

Section 53-21-129, MCA. It is clear that the operative phrases are "seriously mentally ill" and "emergency situation;" it is equally clear that both elements must be met before a person may be detained pursuant to § 53-21-129, MCA.

"Seriously mentally ill" is statutorily defined to mean:

> suffering from a mental disorder which has resulted in self-inflicted injury or injury to others or the imminent threat of injury or which has deprived the person afflicted of the ability to protect the person's life or health. For this purpose, injury means physical injury. A person may not be involuntarily committed to a mental health facility or detained for evaluation and treatment because the person is . . . suffering from a mental disorder unless the condition causes the person to be seriously mentally ill within the meaning of this part.

16

Section 53-21-102(15), MCA (emphasis added). "Emergency situation" is statutorily defined to mean "a situation in which any person is in imminent danger of death or serious bodily harm from the activity of a person who appears to be seriously mentally ill." Section 53-21-102(4), MCA.

Nothing of record relied on by the Court establishes that the necessary circumstances existed here to support the emergency detention of G.P. As a result, I conclude that the detention was not legal. I begin with the assumption, seemingly established by the record, that G.P. suffers from a mental disorder. Section 53-21-102(15), MCA, makes it clear that suffering from such a disorder is merely the threshold inquiry in determining whether a person is seriously mentally ill: it is not sufficient to detain a person under § 53-21-129, MCA, or to involuntarily commit that person pursuant to §§ 53-21-121 through 53-21-126, MCA.

The first question before the Court, then, must be whether G.P. met any of the disjunctive criteria set forth in the statutory definition of "seriously mentally ill." In this regard, only the testimony of Dr. David Carlson is relevant, because he is the only "professional person" involved in this matter and is the person whose contact with the Billings police resulted in G.P.'s emergency detention. Phillip Oliver's written support for the involuntary commitment of G.P., set out at length in the Court's opinion, is totally irrelevant to this issue: Mr. Oliver, an attorney and friend of G.P., is indisputably not a "professional person" for purposes of the emergency detention statute.

The Court cites the following as the totality of Dr. Carlson's

17

testimony about G.P.'s pre-detention situation:

1. Dr. Carlson had treated G.P. following an earlier hospitalization three months earlier.
2. G.P. had a "history of depression with suicide ideation and behavior."
3. G.P. suffers from manic depressiveness.
4. In the days before the emergency detention, Dr. Carlson received phone calls from persons concerned about G.P.'s mental health.
5. In Dr. Carlson's opinion, G.P. was in a manic high in the days immediately preceding the detention, and would become severely depressed when he "crashed" from that high.
6. It was Dr. Carlson's opinion that G.P. had "no insight, very agitated, suicide rife."

While this testimony may well establish that G.P. has a history of, and suffers from, a mental disorder, it does not establish that G.P. was seriously mentally ill at the time of the detention as required by statute. The testimony does not show that G.P.'s mental disorder has resulted in injury to himself or others or the imminent threat of such injury: nor does it show that the mental disorder has deprived G.P. of the ability to protect his own life or health. See § 53-21-102(15), MCA.

Dr. Carlson's testimony also does not establish the existence of an "emergency situation" as the legislature defined it in § 53-21-102(4), MCA. Nothing in that testimony shows that G.P. or another person was in "imminent danger" of death or serious bodily harm from G.P.'s activities.

While I agree with the Court's statement that a § 53-21-129, MCA, determination of "whether an emergency situation exists is left to the professional person," I agree only in the context of applicable statutory definitions. The Court apparently intends to allow "professional persons" to define both "seriously mentally ill" and "emergency situation" as the mood strikes them and without

18

regard to statutory definitions.    The result of the Court's decision is exactly contrary to the legislature's carefully stated intent that a person may not be either detained under the emergency detention statute or involuntarily committed on the basis of a mental disorder unless that disorder causes the person to be seriously mentally ill.    Moreover, the Court's decision results in an unprecedented and unjustified expansion of the State's ability to detain Montana citizens who suffer from mental disorders but who have not been shown to be a danger to themselves or others.    I cannot agree that these results are legally correct or otherwise appropriate.    I dissent.

_____
                           Justice

Justice William E. Hunt, Sr., dissenting:

    I join in the dissent of Justice Gray.

_____
                           Justice

19

September 12, 1994

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that the following certified order was sent by United States mail, prepaid, to the following named:


Terry L. Seiffert
Attorney at Law
P. 0. Box 31181
Billings, MT 59107

Dennis J. Paxinos
Yellowstone County Attorney
P.O. Box 35025
Billings, MT 59107

Hon. Joseph P. Mazurek, Attorney General
Carol Schmidt, Assistant
Justice Building
Helena, MT 59620

EO SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY _____ Gallagher
Deputy