No. 03-816

IN THE SUPREME COURT OF THE STATE OF MONTANA

2005 MT 35

IN THE MATTER OF T.S.D.,

        Respondent.

APPEAL FROM:    District Court of the Second Judicial District,
In and For the County of Butte-Silver Bow Cause No. DD 99-1
Honorable Kurt D. Krueger, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

                Paulette Kohman (argued), Special Assistant Attorney General
DPHHS Office of Legal Affairs, Helena, Montana

                Mike Clague, Deputy County Attorney, Butte-Silver Bow
County Attorney's Office, Butte, Montana

        For Respondent:

                Andree Larose (argued), Attorney at Law, Montana Advocacy
Program, Helena, Montana

Orally Argued and Submitted:  November 3, 2004

Decided:  February 22, 2005

Filed:

_____
                     Clerk

Chief Justice Karla M. Gray delivered the Opinion of the Court.

¶1    The Montana Department of Public Health and Human Services (Department) appeals from two orders of the Second Judicial District Court, Silver Bow County, determining that T.S.D. is not seriously developmentally disabled, concluding that § 53-20-132, MCA, is unconstitutional and ordering the Department to provide T.S.D. with appropriate individualized community-based developmental disability services. We reverse.

¶2    The Department raises the following three issues:

¶3    1. Did the District Court err in concluding that T.S.D. is not seriously developmentally disabled?

¶4    2. Did the District Court err in concluding that § 53-20-132, MCA, is unconstitutional?

¶5    3. Did the District Court err in ordering the Department to provide T.S.D. with appropriate individualized community-based developmental disability services?

¶6    Because we reverse the District Court on the first issue raised, we need not address the Department's second and third issues.

## BACKGROUND

¶7    T.S.D. is a developmentally disabled adult diagnosed with personality change due to a medical condition. When he was approximately three years old, he experienced a near-drowning incident which resulted in neurological damage leaving him developmentally disabled. As a result, T.S.D. has impulse control disorder which makes it difficult for him to attend to given tasks, causes paranoid thinking and makes him easily agitated or angered,

2

which in turn causes him to become physically and verbally aggressive toward people around him. T.S.D. also has been diagnosed with bipolar disorder.

¶8 In June of 1999, the Department petitioned the District Court for an emergency commitment of T.S.D. based on a report that he had sexually assaulted his three-year-old niece. The petition alleged that T.S.D. was seriously developmentally disabled, he posed a danger to himself or others, and an emergency commitment was necessary to protect T.S.D. and others while the Department sought an adjudication on a petition for extended commitment. The court held a hearing on the petition and, on July 26, 1999, entered its order finding T.S.D. to be seriously developmentally disabled and ordering that he be committed to the Montana Developmental Center (MDC)--a state residential facility--for 90 days.

¶9 The Department subsequently petitioned to have T.S.D. committed to the MDC for a one-year period, alleging he continued to be seriously developmentally disabled, posed a danger to himself and others, and was in need of treatment at a residential facility. The District Court held a hearing on the petition and entered its order on November 10, 1999, concluding T.S.D. was seriously developmentally disabled and ordering he be committed to the MDC for a period not exceeding one year. In December of 2000, the District Court again ordered that T.S.D. be committed to the MDC for a one-year period based on its conclusion that he continued to be seriously developmentally disabled and in need of treatment at a residential facility.

¶10 In December of 2001, the Department again petitioned to have T.S.D. recommitted to the MDC for a one-year period. A hearing on the petition was held in April of 2002, at which witnesses for the Department testified that T.S.D. refused to participate in his sexual offender treatment at the MDC and that, without the close supervision and structure available at the MDC, T.S.D. remained a high risk to reoffend if released into the community. Thus, the Department asserted T.S.D. continued to be seriously developmentally disabled and in need of commitment to a residential facility. T.S.D. presented testimony that he could be more effectively served--and provided with the necessary structure and supervision--in a community-based treatment facility rather than at the MDC.

¶11 On August 12, 2002, the District Court entered findings of fact, conclusions of law and an order in which it determined that, although T.S.D. continues to have behaviors which pose a risk of harm to others, he can be safely and effectively treated in a community-based setting and, therefore, he is not seriously developmentally disabled. The court ordered the Department to develop a plan for providing T.S.D. with appropriate community-based services within 90 days. The court also provided that T.S.D. would remain at the MDC until the written plan for his community-based services was developed and implemented.

¶12 On January 15, 2003, the District Court held a status hearing regarding the implementation of a plan to place T.S.D. in community-based services. On September 11, 2003, the court entered its findings of fact, conclusions of law and order in which it determined that § 53-20-132, MCA, which provides that a court may not order the placement of or delivery of services to a developmentally disabled person in community-based services,

4

is unconstitutional. The District Court also ordered the Department to provide community-based developmental disability services to T.S.D. within 90 days. The Department appeals from the District Court's August 12, 2002, order determining that T.S.D. is not seriously developmentally disabled and the court's September 11, 2003, order.

## STANDARD OF REVIEW

¶13 We review a district court's determination in a civil commitment case to determine whether the court's findings of fact are clearly erroneous and its conclusions of law are correct. In re Mental Health of S.C., 2000 MT 370, ¶ 8, 303 Mont. 444, ¶ 8, 15 P.3d 861, ¶ 8. A finding of fact is clearly erroneous if it is not supported by substantial evidence, if the district court misapprehended the effect of the evidence or if, after a review of the entire record, we are left with the definite and firm conviction that a mistake has been made. Matter of Mental Health of L.C.B. (1992), 253 Mont. 1, 6, 830 P.2d 1299, 1302.

## DISCUSSION

¶14 Did the District Court err in concluding that T.S.D. is not seriously developmentally disabled?

¶15 We begin our discussion of this issue with a general overview of the statutory procedures governing the commitment of developmentally disabled persons contained in Title 53, chapter 20, part 1 of the Montana Code Annotated. Such a commitment proceeding may be initiated by someone requesting the county attorney to file a petition alleging that a person is seriously developmentally disabled and in need of commitment to a residential

facility. Section 53-20-121(1), MCA. "Seriously developmentally disabled" means a person who

(a)  has a developmental disability;

(b)  is impaired in cognitive functioning; and

(c)  has behaviors that pose an imminent risk of serious harm to self or others or self-help deficits so severe as to require total care or near total care and who, because of those behaviors or deficits, cannot be safely and effectively habilitated in community-based services.

Section 53-20-102(15), MCA. A "residential facility" is defined as the MDC. Section 53-20-102(11), MCA.

¶16    A copy of the petition must be sent to the residential facility screening team (RFST), which is a team of appointed persons "responsible for screening a respondent to determine if the commitment of the respondent to a residential facility is appropriate." Sections 53-20-121(3) and -102(12), MCA. If the RFST concludes the respondent is seriously developmentally disabled and recommends commitment, the RFST must file a written report with the district court which must include its recommendation, the factual basis for the recommendation and a description of any tests or evaluations used in reaching the determination. Section 53-20-125(2), MCA. Notice of the RFST's report also must be given to the respondent, the county attorney, the MDC and various other individuals. Section 53-20-125(4), MCA. Upon request, the district court must hold a hearing regarding the RFST's recommendation. Section 53-20-125(5), MCA.

¶17 A person may be committed to the MDC only if he or she is 18 years of age or older, and both the RFST and a court have determined the person is seriously developmentally disabled and in need of commitment. Section 53-20-125(1), MCA. Thus, upon receiving a recommendation from the RFST, a district court must order a respondent committed to the MDC for an extended period of treatment and habilitation if the court determines that the respondent is seriously developmentally disabled and in need of such commitment. Section 53-20-125(8), MCA. The court must enter findings of fact in support of a commitment order and also must specify the maximum period for the commitment, which cannot exceed one year. Sections 53-20-125(11) and -126, MCA.

¶18 If the court determines the respondent is developmentally disabled and in need of developmental disability services, but is not seriously developmentally disabled, it must dismiss the petition and refer the respondent to the Department to be considered for placement in community-based services. Section 53-20-125(8), MCA. If the court determines the respondent is not developmentally disabled or is not in need of developmental disability services, it must dismiss the petition. Section 53-20-125(8), MCA.

¶19 A respondent also may be committed to the MDC pursuant to an emergency commitment proceeding "when necessary to protect the person or others from death or serious bodily harm." Section 53-20-129(1), MCA. The RFST must file a report and recommendation with the district court within seven days of the filing of the petition and the court may order the commitment if it determines that emergency commitment is necessary to protect the respondent or others from death or serious bodily injury. Section 53-20-

7

129(5), (7), MCA. An emergency commitment is limited to 30 days following the respondent's placement in the MDC, but the RFST may recommend--and a petition may be filed requesting--that the respondent be committed on an extended basis. Section 50-23-129(9), (10), MCA.

¶20    Once a respondent is committed to the MDC under either § 53-20-125, MCA, or § 53-20-129, MCA, the qualified mental retardation professional (QMRP) responsible for the respondent's habilitation must request that a petition for recommitment be filed if the QMRP determines the respondent continues to be seriously developmentally disabled and in need of commitment to the MDC beyond the term of the current commitment period. Section 53-20-128(1), MCA. The QMRP must file a written report of the recommendation and the respondent again must be screened by the RFST. Section 53-20-128(3), (4), MCA. If the district court then determines the respondent continues to be seriously developmentally disabled and in need of continued commitment to the MDC, it may order the recommitment. Section 53-20-128(8), MCA.

¶21    In the present case, T.S.D. initially was committed to the MDC in July of 1999 pursuant to an emergency commitment petition. In November of 1999, the District Court ordered his commitment be extended for a period not to exceed one year. In December of 2000, the court ordered T.S.D. to be recommitted, again for a period not to exceed one year. In each proceeding, the Department asserted--and the District Court determined--that T.S.D. was seriously developmentally disabled in that he was developmentally disabled, impaired in cognitive functioning, had behaviors that posed an imminent risk to himself or others and,

8

because of those behaviors, could not be safely and effectively habilitated in the community. Specifically, the Department presented testimony establishing that T.S.D. had aggressive and sexually assaultive behaviors which posed a risk to others and for which he needed ongoing treatment in a structured and well-supervised environment which could be provided only at the MDC.

¶22 In December of 2001, the QMRP responsible for T.S.D.'s habilitation requested the Department to again petition for T.S.D.'s recommitment to the MDC. In its written report filed with the District Court, the RFST stated that T.S.D. had been placed at MDC because he committed a sex offense against a small child, that he consistently has been refusing to participate in his sexual offender treatment program at the MDC, that he has stated several times that he is dropping out of the treatment program and that, without effective treatment, he continues to present a high risk of reoffending if placed in the community. His participation in other counseling programs at the MDC also generally has been inconsistent and noncompliant, and he has been exhibiting severe aggression toward MDC staff and other clients. Furthermore, according to the RFST's report, T.S.D. refuses to accept responsibility for his mistakes or acknowledge the need for him to change his behaviors, which add to the risk of his reoffending in the community. The report concluded with the following statement explaining why the RFST did not recommend T.S.D. be referred for placement in community-based services:

> He is not referred because of his volatile nature, unstable mood and behavior, disregard for the rights of others and inability to accept his need for some form of habilitation. With such blatant disregard for others he is a high risk for

taking advantage of any situation or person. He does not seem to believe that rules or laws apply to him. He is himself vulnerable because he will overstate his ability, and get into trouble before he even realizes what he is doing. He is not to be left alone with children. He has demonstrated that he does well in a very structured environment but he denies he needs supervision, support or staffing. It is mandatory that he take his medications and this is one thing he did not do when in the community.

¶23 In April of 2002, the District Court held a hearing on the recommitment petition. In support of the petition, the Department presented the testimony of Daphne Crosbie (Crosbie), the chair of the RFST; Dr. Robert Brown (Brown), a supervisor and therapist in charge of the sexual offender treatment program at the MDC; and Judy Hunt (Hunt), the QMRP at the MDC in charge of T.S.D.'s habilitation. Each of the Department's witnesses testified that T.S.D. posed a serious risk to himself and the community, and could not be safely and effectively habilitated in a community-based setting. T.S.D. presented the testimony of Larry Noonan (Noonan), chief executive officer of AWARE, Inc. (AWARE). AWARE is a nonprofit corporation which provides community-based services to developmentally disabled people across the state. Noonan testified regarding the type, quality and effectiveness of services AWARE could provide T.S.D. should he be released into the community.

¶24 Following the hearing, the District Court entered findings of fact, conclusions of law and an order. In its findings of fact, the court observed that both Hunt and Brown testified that T.S.D. was a high risk to reoffend and posed a risk to others if released into the community. The court found that, if T.S.D. were to be released from the MDC, "he would need appropriate treatment, work activities, structure, and supervision." The court further found that prior incidents of sexually offending behavior by T.S.D. occurred when he was

10

not in a structured and supervised living situation and not receiving developmental disability services. Additionally, the court found that Noonan testified T.S.D. could be safely and effectively habilitated in a community-based setting through services provided by AWARE.

¶25 In its conclusions of law, the District Court determined that T.S.D. is developmentally disabled and has behaviors which pose a risk of harm to others. However, based on its finding that Noonan testified T.S.D. could be safely and effectively habilitated in the community through services provided by AWARE, the court concluded that T.S.D. "can be safely and effectively habilitated in a community setting with appropriate supports and services." Consequently, the court further concluded that T.S.D. was not seriously developmentally disabled within the meaning of § 53-20-102(15), MCA.

¶26 The Department contends the District Court's finding that Noonan's testimony established T.S.D. could be safely and effectively habilitated in a community-based setting is clearly erroneous. It asserts that this finding is not supported by substantial credible evidence, the court misapprehended the effect of the evidence and a review of the record reveals that the court made a mistake. The Department further contends that the District Court's conclusion--based on this erroneous finding--that T.S.D. is not seriously developmentally disabled is incorrect. T.S.D. responds that Noonan's testimony provided substantial evidence supporting the finding that T.S.D. can be safely and effectively habilitated in a community setting and, therefore, the court's conclusion that T.S.D. is not seriously developmentally disabled is correct. We observe that the parties do not dispute that T.S.D.

11

is developmentally disabled, is impaired in cognitive functioning and has behaviors which pose a risk of harm to himself or others.

¶27   Noonan testified at the 2002 hearing regarding the services AWARE could provide T.S.D. if he were released from the MDC into the community.  He reported that AWARE employs qualified therapists who offer treatment and therapy for developmentally disabled people with sexually offending behaviors.  He stated that the treatment services offered by AWARE could be individualized to address and adapt to T.S.D.'s specific needs more effectively than the treatment currently provided to T.S.D. at the MDC.  Noonan further testified that AWARE could place T.S.D. in an individual living arrangement--as opposed to the group living arrangements provided at the MDC--where the environment would be less chaotic and he would not have to compete with others for the attention of the staff providing his services.  Noonan also specifically testified that T.S.D. could be effectively habilitated--indeed, more effectively than at the MDC--in a community-based setting.  We conclude that substantial evidence supports the District Court's finding that Noonan testified T.S.D. could be "effectively" habilitated in community-based services.

¶28   As set forth above, the District Court also found that Noonan testified T.S.D. could be "safely" habilitated in the community.  In this regard, the record reflects Noonan's testimony that the most important factors necessary to keep T.S.D. and others safe were supervision and structure.  He further testified that AWARE could afford such supervision and structure by providing T.S.D. with constant supervision by at least one staff member on a 24-hour-per-day basis, equipping his home with a door alarm to inform supervisory staff

12

if he attempts to leave, and implementing a structured daily schedule regulating his living environment, work program and recreational activities. However, Noonan was not directly asked, and did not expressly testify, whether T.S.D. could be "safely habilitated in community-based services" as contemplated by § 53-20-102(15), MCA. Consequently, the District Court's specific finding that Noonan "testified [T.S.D.] could be safely and effectively habilitated in a community-based setting . . ." (emphasis added) is not supported by the evidence and is clearly erroneous.

¶29    Moreover, to the extent the District Court's conclusion that T.S.D. is not seriously developmentally disabled is based on an implicit finding that T.S.D. can be safely habilitated in the community, we conclude such an implicit finding is clearly erroneous because our review of the record discloses no evidence supporting it. Specifically, our review of the testimony presented at the 2002 hearing leads us to the conclusion that the Department established T.S.D. could not be "safely" habilitated in a community-based setting.

¶30    Crosbie, the chair of the RFST that recommended T.S.D. be recommitted, testified that the RFST's recommendation was based on T.S.D.'s continued refusal to participate in treatment at the MDC. She testified that, without participation in--and completion of--sexual offender therapy, T.S.D. remained at high risk to reoffend if placed in the community. Crosbie further testified that an additional concern to the RFST was that, when in the community in the past, T.S.D. had declined to take his medications on a regular basis. She stated that consistently taking his medication was crucial for his condition and, while at the MDC, T.S.D. could not refuse medication.

¶31 Brown, T.S.D.'s sexual offender therapist at the MDC, testified that T.S.D. posed a danger to himself and others because of his inability to control his impulses, his history of terminating treatment services when in the community and his great threat of reoffending because of his inability to control his impulses. Additionally, Brown stated that T.S.D. had been suspended from his sexual offender treatment program at the MDC because of his refusal to participate in the program and his assaultive behavior toward others. In other words, according to Brown, T.S.D. had not been able to profit from treatment because of his failure to participate. Brown further testified that, in his opinion, T.S.D. was seriously developmentally disabled, that it was imperative T.S.D. remain in a structured, highly supervised setting and that, "if he's not in a contained setting, he leaves and becomes dangerous to children." For these reasons, Brown opined that T.S.D. could not be safely habilitated in the community.

¶32 Hunt, the QMRP in charge of T.S.D.'s habilitation at the MDC, testified that T.S.D. would pose a danger to others in the community if released from the MDC, that "[t]he greatest danger lies in his non-compliance," and that the best protection for T.S.D. and others would be commitment to a facility such as the MDC where he could not voluntarily leave or terminate services. She further testified that T.S.D. has not been complying with his sex offender treatment program and, without such treatment, he is a high risk to reoffend in the community.

¶33 With regard to the Department's concerns, the record reflects that Noonan agreed T.S.D. has behaviors which pose a risk to the community. Noonan also testified that, although AWARE could provide structure and supervision for T.S.D., T.S.D.'s continued

14

use of those services would be entirely voluntary. Indeed, Noonan expressly conceded T.S.D. could terminate his community-based developmental disability services at any time, AWARE could not force him to return to the program, and AWARE could not force him to take his medication.

¶34 In the present case, therefore, the following facts are undisputed: (1) that T.S.D. has behaviors which pose an imminent risk of serious harm to self or others; (2) in order to be safely habilitated in the community, T.S.D. needs constant supervision and structure; (3) if released from the MDC and placed in community-based services, T.S.D. cannot be forced to participate in treatment and may voluntarily terminate those services at any time, as well as refuse his medication; and (4) T.S.D. has a demonstrated history of terminating his participation in community-based services and not taking his medication.

¶35 We conclude the record of the 2002 hearing is devoid of any evidence that T.S.D. can be "safely" habilitated in the community and, therefore, any implicit finding of fact to the contrary by the District Court is clearly erroneous. Consequently, we further conclude that, because T.S.D. cannot be safely habilitated in the community, he is seriously developmentally disabled as defined in § 53-20-102(15), MCA. We hold, therefore, that the District Court erred in concluding that T.S.D. is not seriously developmentally disabled.

¶36 Reversed.

/S/ KARLA M. GRAY

We concur:

/S/ JAMES C. NELSON

15

/S/ PATRICIA O. COTTER
/S/ JOHN WARNER
/S/ JIM RICE
/S/ W. WILLIAM LEAPHART
/S/ INGRID GUSTAFSON
     District Judge, sitting for former Justice Jim Regnier