# IN THE MATTER OF THE MENTAL HEALTH OF L. K., Respondent and Appellant.

No. DA 07-0456.
Submitted on Briefs April 2, 2008.
Decided May 13, 2008.
2008 MT 169.
343 Mont. 366.
184 P.3d 353.

For Appellant: **Robin Amber Meguire**, Meguire Law; Great Falls.

For Appellee: **Hon. Mike McGrath**, Attorney General; **Tammy K Plubell**, Assistant Attorney General, Helena; **Joe Coble**, Teton County Attorney, Choteau.

JUSTICE RICE delivered the Opinion of the Court.

¶1 Appellant L.K. was involuntarily committed to the Montana State Hospital after a hearing in the Ninth Judicial District Court, Teton County. The District Court concluded that L.K. suffered from a serious mental disorder and was a danger to herself or others. L.K. appeals the order committing her to the Montana State Hospital. We affirm.

¶2 We restate the issues on appeal as follows:

¶3 1. Did the District Court err by finding that an emergency situation justified L.K.'s detainment pursuant to § 53-21-129, MCA (2005)?

¶4 2. Did the District Court err by concluding that the immediate notice requirements under § 53-21-114, MCA (2005), were not applicable because L.K. was detained on an emergency basis?

¶5 3. Did the District Court violate L.K.'s constitutional rights by periodically muting the microphone at the Montana State Hospital in order to control L.K.'s disruptive behavior during the final commitment hearing?

### FACTUAL AND PROCEDURAL BACKGROUND

¶6 On June 26, 2007, the Teton County Attorney filed a petition in the District Court alleging L.K. suffered from a mental disorder requiring commitment. The facts in support of that petition included eight incidents reported to the Teton County Sheriff in a five-day period alleging, among other things, that L.K. was screaming obscenities at members of the public, disrupting City offices by making agitated and irrational complaints, moving traffic barriers, and trespassing and vandalizing private property. The District Court found probable cause for emergency detention but concluded that, based on the report of L.K.'s independent Professional Person, Pat Davis, while

L.K. suffered from a psychotic disorder, there was no indication that she presented an imminent threat to herself or others. On July 2, 2007, the District Court dismissed the June 26 Petition.

¶7 On July 5, 2007, the State filed a second Petition for Commitment and Detention. The facts in the second petition included approximately twenty-five incidents reported to the Teton County Sheriff between July 2, 2007, and July 5, 2007, alleging, among other things, that L.K. had been aggressively harassing citizens in her community, had barricaded an intersection of her street in order to keep the street "quiet," and had vandalized property. According to Teton County Sheriff Keith Van Setten (Van Setten), approximately 90 percent of his and his deputies' time was spent following up on complaints regarding L.K. over the course of those few days.

¶8 Two events reported to Van Setten were particularly notable. First, on July 4, 2007, Elaine Wiseman (Wiseman) was at the Choteau rodeo with her family, with L.K. seated behind them. When the rodeo ended, Wiseman and her family stood in the bleachers waiting for the crowd to thin out. Without provocation, L.K. lunged at Wiseman from behind, grabbed Wiseman's throat, and said, "I'm going to kill you." Wiseman's husband immediately interceded, at which time L.K. backed off and apologized. Wiseman reported the assault to a police officer. Second, also on July 4, 2007, McKenzie Higgins (Higgins), an eight-year-old girl, after attending a Willie Nelson concert in Choteau, was walking to find her mother when she accidentally cut in front of L.K. L.K. tried to kick Higgins, who jumped out of the way. L.K. then pretended to point a gun at Higgins' head and said to her, "Thanks for dying." Higgins then walked slowly away from L.K. in search of her mother, afraid that if she ran away it would further agitate L.K. Based on these and other episodes, the Teton County Attorney filed a second commitment and detention petition on July 5.

¶9 On July 5, Dr. Laura Shelton and her physician's assistant, Tim Sinton, attempted to examine L.K. at the emergency room. L.K. was uncooperative and physically threatening, so Dr. Shelton ended the interview. Dr. Shelton stated she would not want to be alone with L.K. Based on this encounter and the information she received from law enforcement, Dr. Shelton concluded L.K. was suffering from a serious mental disorder and was a danger to herself or others.

¶10 The District Court conducted a detention hearing on July 6, 2007, with attorney William Hunt (Hunt) appearing on L.K.'s behalf as her appointed counsel. L.K. appeared via video-conference from the Montana State Hospital, where she had been taken, and repeatedly

interrupted the proceedings by directing remarks to the District Judge and to counsel for both parties. Nonetheless, the District Court was able to advise L.K. of her constitutional and statutory rights. Hunt also moved to dismiss the petition, first arguing there was no foundation to justify L.K.'s detention, and also that the petition should be dismissed because L.K. was not immediately advised of her rights upon detention. The District Court found probable cause for the July 5 Petition and ordered L.K.'s emergency detention at the Montana State Hospital in Warm Springs or another suitable facility for the purpose of having a professional person examine L.K. The District Court scheduled a final hearing for July 11, 2007.

¶11 On July 9, 2007, Rick Wagner (Wagner), a crisis response therapist for Western Montana Mental Health Center and a certified professional person, attempted to interview L.K at the Montana State Hospital. L.K. refused to speak with Wagner. Wagner was able to evaluate L.K. on July 10, 2007, and concluded that L.K. suffered from a psychotic disorder and needed–but refused–medication. Based in part on L.K.'s assaults of Higgins and Wiseman, Wagner believed that, if left untreated, it was predictable that L.K.'s mental condition would further deteriorate to the point where she would be a danger to herself or to others. Wagner recommended that L.K. be involuntarily committed to the Montana State Hospital and involuntarily medicated.

¶12 The final commitment hearing was held on July 11, 2007, at which Wiseman, Higgins, Wagner, Van Setten, and Dr. Shelton testified. L.K. was once again represented by Hunt and appeared via video-conference from the Montana State Hospital. From the outset, L.K. was extremely disruptive of the proceedings, constantly interrupting Judge McKinnon, the county attorney, and her own counsel by making incongruous, accusatory remarks despite a warning and instructions that she would be given an opportunity to speak. For example, as soon as Judge McKinnon began the proceedings, the following exchange occurred:

THE COURT: Alright, this is ... DI-07-002, In the Matter of [L.K.]. The State has filed–

RESPONDENT: Can this person claiming to be judge please identify yourself?

MR. HUNT: [L.K.], I'm advising you to keep silent.

RESPONDENT: I'm advising you to keep silent, Mister. I have more authority than you.

THE COURT: Okay, [L.K.], you'll have an opportunity–

RESPONDENT: Can this person–

THE COURT: You will have—

RESPONDENT: At the other end of the table, please identify yourself.

THE COURT: Miss [L.K.]—

RESPONDENT: You claim to be a judge. Please identify yourself.

THE COURT: You will have an opportunity to address, to speak. I'm going to tell you now, you do not speak—

RESPONDENT: I have not had an opportunity to speak.

THE COURT: You do not speak until I've asked you to speak and given you that opportunity. You have an attorney here.

RESPONDENT: Do not speak until you identify yourself.

THE COURT: I will tell you right now that if you keep interrupting, I will mute Warm Springs so that you cannot interrupt this proceeding. This is a warning.

RESPONDENT: What else is new?

L.K. relented somewhat, but shortly thereafter interjected once again:

RESPONDENT: Person sitting as judge has not been recognized as judge by the town in which she sits.

THE COURT: What? All right.

RESPONDENT: Are you speaking for yourself, and calling yourself the State, Miss?

THE COURT: Mr. Wagner, is there a way to mute the, so that you can still hear but I don't want to hear from you at this point?

WARM SPRINGS STAFF: Yes, Your Honor. We can mute.

THE COURT: All right, please do that. She's been warned and now we're going to mute it.... This proceeding has to go forward in an efficient manner and we'll proceed now....

¶13 Because L.K.'s counsel was not at Warm Springs, the District Court gave him an opportunity to speak with L.K. directly before excusing any witnesses. After the State's first witness completed her testimony, the District Court instructed the Warm Springs Staff to reactivate the microphone. The District Court then explained to L.K. that it was giving her another opportunity to participate in the hearing, but that if she continued interrupting, the Warm Springs microphone would be muted again. However, as Wiseman was testifying, L.K. once again began interrupting the proceedings, and the microphone was again muted. When Wiseman's testimony was complete, L.K.'s microphone was activated again. As L.K. continued to intermittently interject comments into the proceedings and argue with the District Court and her own counsel, the District Court again muted

the microphone. The District Court made it clear to L.K.'s attorney that he need only let the court know if he needed to confer with L.K. at any time, at which point the court would allow him to do so.

¶14 Eventually Wagner, who was also located in Warm Springs, was called to testify and the microphone was activated again to allow for his testimony. L.K. interjected comments into just about every question asked of Wagner and every answer he gave, to the extent that when Hunt began cross-examining Wagner, he warned his client that if she did not remain quiet, he would ask the District Court to remove her from the room because he could not otherwise effectively represent her. L.K. continued to interrupt and interject comments during the remainder of Wagner's testimony, although she was not removed from the room.

¶15 After the State rested, L.K. insisted on testifying. The following dialogue then occurred between L.K. and her counsel:

MR. HUNT: Okay, Ms. [L.K.], would you state your name?

RESPONDENT: [L.K.].

MR. HUNT: [L.K.], okay, thank you. Where do you reside, [L.K.]?

RESPONDENT: I reside in a State named Montana.

MR. HUNT: Okay, which town?

RESPONDENT: I prefer that you don't try to make my small town famous, Mister, just because your ketchup is inferior.

MR. HUNT: Which town do you live in? Do you live in Choteau, Montana?

RESPONDENT: Tell what town I live in.

MR. HUNT: Do you suffer from a mental illness, Ms. [L.K.]?

RESPONDENT: No, I do not. You've already asked that question.

MR. HUNT: Do you—

RESPONDENT: Do you?

MR. HUNT: Have you ever been hospitalized before?

RESPONDENT: Have you ever read a book about how the CIA did studies on—

MR. HUNT: Ms. [L.K.], I—Ms. [L.K.], I'm advising you not to testify any more.

RESPONDENT: Have you ever read a book about how the CIA used medications to drive people crazy?

MR. HUNT: Ms. [L.K.], I advise you not to testify any more. Your honor, the Respondent rests.

THE COURT: All right. All right, we'll be—

RESPONDENT: Is there anyone here to represent me?

THE COURT: We'll be muting Warm Springs at this point.

¶16 Following the hearing, the District Court entered an Order of Confinement, finding that L.K. was suffering from a serious mental disorder and was a danger to herself or others. The District Court considered a range of treatment alternatives and concluded that commitment to the Montana State Hospital for ninety days was the least restrictive alternative. L.K. appeals.

## STANDARD OF REVIEW

¶17 We review a district court's determination in a civil commitment case to determine whether the court's findings of fact are clearly erroneous and its conclusions of law are correct. *In re T.S.D.*, 2005 MT 35, ¶ 13, 326 Mont. 82, ¶ 13, 107 P.3d 481, ¶ 13. A finding of fact is clearly erroneous if it is not supported by substantial evidence, if the district court misapprehended the effect of the evidence or if, after a review of the entire record, we are left with the definite and firm conviction that a mistake has been made. *In re T.S.D.*, ¶ 13. Constitutional issues of due process and the right to counsel involve questions of law and our review of such questions is plenary. *In re D.V.*, 2007 MT 351, ¶ 28, 340 Mont. 319, ¶ 28, 174 P.3d 503, ¶ 28.

## DISCUSSION

¶18 **Did the District Court err by finding that an emergency situation justified L.K.'s detainment pursuant to § 53-21-129, MCA (2005)?**

¶19 L.K. argues her conduct did not create an emergency situation justifying immediate detainment under § 53-21-129, MCA. Section 53-21-129, MCA, provides, in pertinent part:

(1) When an emergency situation exists, a peace officer may take any person who appears to have a mental disorder and to present an imminent danger of death or bodily harm to the person or to others into custody only for sufficient time to contact a professional person for emergency evaluation. If possible, a professional person should be called prior to taking the person into custody.

(2) If the professional person agrees that the person detained is a danger to the person or to others because of a mental disorder and that an emergency situation exists, then the person may be detained and treated until the next regular business day. At that time, the professional person shall release the detained person or file findings with the county attorney who, if the county attorney determines probable cause to exist, shall file the petition provided

for in 53-21-121 through 53-21-126 in the county of the respondent's residence. In either case, the professional person shall file a report with the court explaining the professional person's actions.

Section 53-21-102(7), MCA (2005), defines an emergency situation as "a situation in which any person is in imminent danger of death or bodily harm from the activity of a person who appears to be suffering from a mental disorder and appears to require commitment."

¶20 In the present case, Sheriff Van Setten determined that an emergency situation existed after receiving twenty-five reports of L.K.'s "extremely bizarre" behavior, and thereafter took L.K. into custody and contacted Dr. Shelton. Nonetheless, L.K. argues that no emergency situation justified her detainment because Dr. Shelton's report merely stated that L.K. was "a threat to herself and to society" and not an "imminent danger of death or bodily harm." L.K. also argues that even though the July 5 Petition alleged that she lunged at someone in an aggressive manner, tried to kick an eight-year-old child and pointed her fingers like a gun while stating "thanks for dying," and, as she characterizes it, had "minor incidents of yelling, making incongruous remarks, moving traffic barricades, removing signs, and trespassing," none of these events were evidence of an emergency situation.

¶21 The State responds that "[t]he escalation of events between L.K. and innocent members of the public, including an eight-year-old child, whom L.K. attempted to kick, is what created an emergency situation ...." The State points out that over a three-day period, local law enforcement received more than twenty-five reports complaining of L.K.'s erratic behavior and had to devote almost all of its resources to those complaints. The State further notes that L.K.'s aggressive, threatening behavior prevented Dr. Shelton from even completing a formal evaluation, and consequently led to Dr. Shelton's conclusion that L.K. appeared "to be a threat to society and to herself."

¶22 ■■ We agree with the State that an emergency situation existed and that the facts alleged in the petition were sufficient to justify L.K.'s emergency detention under § 53-21-129, MCA. After twenty-five incidents were reported to the Teton County Sheriff over the course of three days, including unprovoked events in which L.K. put her hands around Wiseman's throat and attempted to kick Higgins, L.K. was detained by local authorities. At that time, Dr. Shelton, a professional person, attempted to formally evaluate L.K. L.K. was aggressive and threatening to Dr. Shelton, and based on that conduct and the

information she received from local authorities, Dr. Shelton concluded that L.K. was a threat to herself and others. "Under § 53-21-129(2), MCA, the determination of whether a person appears to be seriously mentally ill and an emergency situation exists is left to the professional person, whose request for emergency detainment is sufficient for detainment until the next business day." *In re G.J.P.*, 266 Mont. 370, 375, 880 P.2d 1311, 1314 (1994). Applying the definition of an "emergency situation" in § 53-21-102(7), MCA, a situation clearly existed in which L.K. or another person was in imminent danger of death or bodily harm, be it from L.K.'s infliction of harm on an innocent bystander or from a bystander who believed it necessary to respond physically to L.K.'s actions. L.K. certainly appeared "to be suffering from a mental disorder and appear[ed] to require commitment." Section 53-21-102(7), MCA. Accordingly, her detainment was justified under § 53-21-129, MCA.

¶23 **Did the District Court err by concluding that the immediate notice requirements under § 53-21-114, MCA (2005), were not applicable because L.K. was detained on an emergency basis?**

¶24 L.K. argues that the mental health commitment statutes required that she be informed of her constitutional rights at the time of her detainment, and that the failure to read L.K. her rights until the next day deprived her of due process. The State responds that immediate notice of constitutional rights is not required when a person is detained in an emergency situation pursuant to § 53-21-129, MCA.

¶25 The requirement that a person involuntarily detained pursuant to the commitment statutes be notified of his or her constitutional rights is set forth in § 53-21-114(1), MCA, which provides: "Whenever a person is involuntarily detained *pursuant to 53-21-121 through 53-21-126*, the person shall at the time of detention be informed of his constitutional rights and his rights under this part." (Emphasis added.) Under this language, § 53-21-114(1), MCA, does not incorporate those detentions made pursuant to the emergency detention statute within its notification requirements. Further, § 53-21-129, MCA, does not contain its own notification requirement. Nonetheless, L.K. argues the emergency commitment statute required that she be given immediate notification of her rights.

¶26 Our role in interpreting a statute "is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted." Section 1-2-101, MCA (2005). If the Legislature intended the

notification required by § 53-21-114(1), MCA, to apply to emergency detentions under § 53-21-129, MCA, it could have included those detentions. However, these statutes treat emergency detentions separately. Section 53-21-129(2), MCA, provides that when a person is detained on an emergency basis, he or she may be detained and treated until the next regular business day. At that point, the professional person must either "release the detained person or file findings with the county attorney who, if the county attorney determines probable cause to exist, shall file the petition provided for in 53-21-121 through 53-21-126." Section 53-21-129(2), MCA. Only if a petition is filed do the notification requirements provided under § 53-21-114(1), MCA, become operative. Although L.K. argues that her commitment must be reversed based upon *In re Shennum*, 210 Mont. 442, 684 P.2d 1073 (1994), the Court there reversed the commitment because, absent an emergency, §§ 53-21-121 through 53-21-126, MCA, had to be followed, but were not. *Shennum*, 210 Mont. at 449-50, 684 P.2d at 1077. However, the emergency which was absent in *Shennum* exists in this case.

¶27 ▮ L.K. offers minimal argument outside her statutorily-based contentions. However, to the extent there would be remaining due process concerns, it is clear that due process notice requirements are " 'flexible' and are adapted by the courts to meet the procedural protections demanded by the specific situation." *State v. Pyette*, 2007 MT 119, ¶ 14, 337 Mont. 265, ¶ 14, 159 P.3d 232, ¶ 14. After her emergency detention, L.K. was advised of her rights the next day. After correctly interpreting §§ 53-21-114(1) and 53-21-129, MCA, the District Court also properly concluded that L.K. was advised of her constitutional rights in a reasonably timely manner, thereby satisfying due process.

¶28 **Did the District Court violate L.K.'s constitutional rights by periodically muting the microphone at the Montana State Hospital in order to control L.K.'s disruptive behavior during the final commitment hearing?**

¶29 L.K. argues that the District Court's muting of the Warm Springs microphone prevented her from being "heard in a meaningful manner" and from being "effectively 'present' during the proceeding." L.K. urges that even though her attorney did not object to the District Court's muting of the microphone at the hearing, this Court should engage in plain error review because her fundamental constitutional rights were implicated. *See e.g. State v. Godfrey*, 2004 MT 197, ¶ 22, 322 Mont. 254, ¶ 22, 95 P.3d 166, ¶ 22 (citation omitted). Alternatively, L.K. argues

she was denied effective assistance of counsel when her attorney did not object.

¶30 The State responds that L.K.'s right to be present at her commitment hearing does not include a right to "totally disrupt the hearing." The State further points out that L.K.'s microphone was not left on mute, but rather was muted only after L.K. repeatedly disrupted the proceedings and continued to do so after further opportunities to comply with the District Court's instructions. Finally, the State argues L.K.'s counsel was not ineffective because L.K.'s conduct only worked to her detriment, and Hunt was able to effectively cross-examine the State's witnesses notwithstanding L.K.'s temporary inability to participate.

¶31 Section 53-21-115(2), MCA (2005), provides that, in addition to the rights granted by the Montana and United States Constitutions, a person who is involuntarily detained has "the right in any hearing to be present, to offer evidence, and to present witnesses. . . ." Likewise, § 53-21-116, MCA (2005), provides that a "person alleged to be suffering from a mental disorder and requiring commitment has the right to be present and the right to counsel at any hearing or trial." Two-way electronic audio-video communication devices may be used for such hearings as long as the audio-video device operates in such a way that the respondent, his or her counsel, and the judge "can see each other simultaneously and converse with each other," the respondent and his or her counsel can converse privately with each other, and the respondent and his or her counsel "are both present during the two-way electronic audio-video communication." Section 53-21-140(2), MCA (2005).

¶32 ■ The District Court afforded L.K. due process and complied with § 53-21-140, MCA, when it conducted L.K.'s final detention hearing via video-conference from the Montana State Hospital. Although L.K. was entitled to communicate with the District Court and her counsel by video-conference, she was not entitled to constantly disrupt the proceedings by interrupting the District Court, the State's witnesses, and counsel for both parties. As explained by the United States Supreme Court in the context of a criminal proceeding:

> Although mindful that courts must indulge every reasonable presumption against the loss of constitutional rights, we explicitly hold today that a defendant can lose his right to be present at trial if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly,

disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom.

*Illinois v. Allen*, 397 U.S. 337, 343, 90 S. Ct. 1057, 1060-61 (1970) (Internal citations omitted).

¶33 ■ In the present case, L.K. was warned that her disruptive behavior would result in the Warm Springs microphone being muted. When L.K. continued her disruptive behavior, the District Court muted the microphone, but the District Court consistently gave L.K. the opportunity to once again conform her behavior to the requirements of an orderly hearing. L.K. could hear each witness's testimony, observe the entire proceeding, and consult with her attorney at any time. We hold that the District Court did not deprive L.K. of her constitutional right to be present and to participate in her commitment hearing, and thus, that L.K.'s counsel was not ineffective for failing to object when L.K.'s microphone was muted.

¶34 Affirmed.

CHIEF JUSTICE GRAY, JUSTICES COTTER, NELSON and MORRIS concur.