
DA 06-0615

IN THE SUPREME COURT OF THE STATE OF MONTANA

2008 MT 200

IN THE MATTER OF G. M.,

        Respondent and Appellant.

APPEAL FROM:   District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. ADI 94-11
Honorable Dorothy McCarter, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

           Andrée Larose (argued) and Thomas A. Dooling, Montana Advocacy
Program, Helena, Montana

      For Appellee:

           Hon. Mike McGrath, Attorney General; Sheri K. Sprigg (argued),
Assistant Attorney General, Helena, Montana

           Leo Gallagher, Lewis and Clark County Attorney; K. Paul Stahl,
Deputy County Attorney, Helena, Montana

Argued and Submitted: September 19, 2007

Decided: June 10, 2008

Filed:

_____
                        Clerk

Justice John Warner delivered the Opinion of the Court.

¶1     G.M. appeals from an order of the District Court of the First Judicial District, Lewis and Clark County, involuntarily recommitting him to the Montana Development Center (MDC).

¶2     G.M. raises five issues on appeal. We conclude, however, that the issue of whether the District Court erred in finding as matters of fact that G.M. posed an imminent risk of serious harm to himself or others, and thus could not be safely habilitated in the community, is dispositive. Thus, we do not discuss in depth the other issues raised.

## FACTUAL BACKGROUND

¶3     G.M. was a thirty-three year old man at the time of the hearing who had spent almost seventeen years of his life at MDC. It is undisputed that G.M. is developmentally disabled as defined by Montana law. It is also undisputed that his self-help deficits do not require total care.

¶4     The Petitioner, the Montana Department of Public Health and Human Services (DPHHS), and G.M. generally agree that he is mild to moderately mentally retarded, which constitutes a developmental disability under Montana law. He needs assistance with conceptualization and understanding simple tasks. With one-on-one staff assistance, G.M. spends a half-hour twice each day, five days a week, delivering mail around MDC's campus. He enjoys this work because it gives him the opportunity to socialize and receive a staff member's full attention. G.M. participates in off-campus outings, on-

2

campus social functions and sporting activities. He also enjoys and looks forward to visits with and phone calls from his brother who lives in Helena and his aunt who lives in Miles City.

¶5 During his time at MDC, G.M. has been referred for community-based services. At the time of the 2006 Petition for recommitment, however, he was not being referred for community services.

¶6 In addition to his developmental disability, G.M. has been diagnosed with mental illness. According to his therapist at MDC, G.M. suffers from a mood disorder, bipolar disorder, impulse control disorder and possibly post-traumatic stress disorder. At MDC, he receives treatment for these disorders. So far, treatment has not eliminated all of G.M.'s behavioral difficulties, specifically physical outbursts that are sometimes violent. Conflicting evidence of the cause, frequency, severity and imminent nature of G.M.'s harmful behavior was presented during G.M.'s 2006 recommitment proceedings.

¶7 On March 3, 2006, the Lewis and Clark County Attorney's Office initiated G.M.'s recommitment proceedings, upon the request of Donna McDuffie, a Qualified Mental Retardation Professional (QMRP) at MDC. The Lewis and Clark County Attorney's Office filed a Petition in the District Court seeking G.M.'s recommitment pursuant to § 53-20-128, MCA (2005). Attached to the Petition was (1) a Recommitment Report prepared by McDuffie on February 12, 2006 (QMRP Report); (2) an Individual Treatment Plan for G.M. prepared at MDC by the treatment committee on February 21, 2006 (ITP); (3) the Community Placement Profile, prepared by McDuffie on February

3

21, 2006; and (4) a Trend Analysis Report, dated February 21, 2006, covering incidents involving G.M. during the period from January 25 to February 20, 2006.

¶8 On March 17, 2006, the Residential Facility Screening Team (RFST) conducted a review of G.M.'s case, as required by § 53-20-133, MCA (2005), to determine whether he continued to meet the criteria to be determined "seriously developmentally disabled" as defined by § 53-20-102(15), MCA (2005), and should be recommitted to MDC for a year. The RFST recommended recommitment and filed its "Determination and Recommendation" with the District Court on March 20, 2006 (RFST Report). The RFST Report was based on psychological reports, medical reports, vocational reports, nursing reports, daily activity reports, social history information, and other information contained in G.M.'s records at MDC, including those attached to the Petition. The RFST Report summarized G.M.'s behavior that supported its recommendation for recommitment, by noting (1) thirty incidents of physical aggression, ten of them severe, five serious; (2) thirty-six incidents of environmental disruptions; (3) two incidents of inappropriate sexual behavior; (4) injuries to others, including a staff person who required medical attention and a peer who required stitches and who had to be moved to another residence for safety; (5) the unpredictable nature of his attacks on others and his sudden mood swings; and (6) verbal aggressiveness.

¶9 A hearing was held on July 10, 2006, to determine if G.M. was "seriously developmentally disabled." The State presented one witness, Daphne Crosbie, a representative of DPHHS and chairwoman of the RFST. G.M. presented two witnesses,

4

Dr. Michael Franczak, an expert, and I.K., G.M.'s legal guardian and aunt. Dr. Franczak is a developmental disability expert who disputed many of the conclusions about G.M. that are contained in MDC's reports. Dr. Franczak prepared a report about G.M. based on G.M.'s records at MDC as well as interviews with G.M. This report was offered and admitted into evidence. The parties stipulated to the admission of two packets of incident reports covering the period from April 5, 2005, to April 29, 2006.

¶10 Crosbie testified that she coordinates the RFST team that considers every Petition for commitment and recommitment to MDC. This team unanimously determined that G.M. should be recommitted. She pointed out the parts of the ITP and underlying reports that persuaded the RFST to recommend G.M.'s recommitment. Specifically, she referred to summaries of incidents in July and November of 2005 in which G.M. engaged in acts of physical aggression toward a male MDC resident, causing injuries, one that resulted in a broken tooth and required stitches. She referred to a different occasion when G.M. attempted to assault a female staff member, causing an injury that required medical attention.

¶11 Crosbie testified that the reports revealed that sometimes four staff members were required to control G.M. and, within the year following the last recommitment order, his aggression resulted in his being placed in a secure unit at MDC at least once. Referring again to the summaries in the reports, she testified that G.M.'s dangerousness and unpredictability make it very difficult for staff to control him and it would be more difficult to control him in community placement than at MDC.

5

¶12 Without objection, Crosbie gave her opinion that G.M. could not be safely habilitated in the community as he is too unstable, and, at the time of the hearing, was worse than he had been previously. Crosbie repeated the summary from the RFST Report that, according to the various reports, G.M. engaged in thirty incidents of aggression in the past year, ten of them severe, and five that were serious. On cross-examination, however, Crosbie could not explain how MDC staff defined the terms "severe," "serious" or "moderate" used in the reports to describe aggressive incidents. Crosbie was also unable to refute the contention that external pressures or people in the communal environment were provoking G.M.'s violent behavior. Crosbie's testimony was also unclear regarding the number of injuries G.M. was alleged to have caused.

¶13 Dr. Franczak, G.M.'s expert witness, is a licensed psychologist with twenty-six years of experience who specializes in treating individuals with dual diagnosis of developmental disabilities and mental illness. He evaluated G.M. twice. The first evaluation was conducted two years before the hearing. He evaluated G.M. again on July 8 and 9, 2006, in preparation for the July 10 hearing. He also reviewed G.M.'s treatment plans since 1987. Dr. Franczak agreed that G.M. had a cognitive impairment, and gave his opinion that G.M.'s inability to process information beyond short sentences and his inability to solve problems resulted in a moderate disability.

¶14 Dr. Franczak testified that, in his opinion, MDC's institutional environment is iatrogenic and creates more problems for G.M. than it solves. He noted that MDC's staff understands what circumstances tend to give rise to G.M.'s outbursts, such as a change of

6

routine, and often is able to prevent such outbursts from escalating into violent incidents by removing him from the group setting and taking him to his room. He also acknowledged that the staff cannot always predict G.M.'s mood swings and cannot always prevent these outbursts. On cross-examination, Dr. Franczak conceded that, within the year since his last commitment, G.M. had physically harmed another person at least once.

¶15 Franczak did not agree, however, with the RFST that G.M. was a threat to himself or others. Instead, Dr. Franczak emphasized that G.M.'s aggressive behavior was a reaction to his MDC surroundings. Dr. Franczak opined that living with eleven other men at MDC made G.M. more aggressive and that the incident report data was inconsistent and misleading.

¶16 Dr. Franczak also testified about the incident reports underlying the summaries. He pointed to fifteen of G.M.'s "aggressive" incidents noted in MDC's incident reports in which someone else was the aggressor and G.M. either defended himself or walked away. These situations were labeled as level 4 incidents of aggression and, because G.M. was peripherally involved, they were attributed to him, which in Franczak's opinion mischaracterized G.M.'s level of aggression.

¶17 As for the inconsistencies in the data, he pointed out that Dr. Caldwell, G.M.'s psychiatrist, stated in his report that G.M. had only been involved in two "serious" incidents in the last year. Yet the QMRP Report noted that from May 2005 to March 2006 G.M. had been involved in fourteen incidents of physical aggression, half of which

were "severe," and the RFST reported thirty incidents of aggression, ten severe, five serious.

¶18 Dr. Franczak testified that G.M. could safely reside in a community placement with appropriate support. He recommended that G.M. live with fewer people, such as two or three, rather than eleven. Dr. Franczak made several other suggestions for ways to make community services available to G.M. and how to prepare him for community services. He testified that he knew of individuals with aggressive tendencies worse than those exhibited by G.M. living successfully in community services.

¶19 Dr. Franczak's opinion was that G.M. is not seriously developmentally disabled and does not meet the criteria for recommitment. After careful analysis of the reports before the Court, and after his own examinations of G.M., Dr. Franczak was of the definite opinion that G.M. could be safely habilitated in a community based setting.

¶20 G.M.'s aunt and legal guardian, I.K., testified that during his visits to her home, G.M. took pleasure in small everyday activities and did not have outbursts like he did at MDC; only moments of mild agitation. She testified that in her opinion G.M. would do well in a community placement.

¶21 On August 2, 2006, the District Court entered written findings of fact, conclusions of law and an order recommitting G.M. The District Court only noted in its findings of fact that Dr. Franczak had recommended that G.M. be placed in a community setting. The District Court made no findings concerning his credibility, or the weight that should be given his analysis of the RFST Report and supporting documentation. Then, noting

8

that it had considered the RFST Report and supporting documentation, the District Court found, by clear and convincing evidence, that, "[i]n the past year, [G.M.] exhibited several occasions of behaviors that posed an imminent risk of serious harm to himself or others," and "continues to have such behaviors, which prevent him from being safely and effectively habilitated in currently available community-based services." The District Court concluded that G.M. was seriously developmentally disabled and continues to be in need of an extended course of treatment. The court added that recommitment to MDC was in G.M.'s best interest. The District Court ordered that G.M. be recommitted to MDC for no more than one year. G.M. appeals from the recommitment order.

## STANDARDS OF REVIEW

¶22 We review a district court's judgment in a civil commitment case to determine whether its findings of fact are clearly erroneous and its conclusions of law are correct. *In re T.S.D.*, 2005 MT 35, ¶ 13, 326 Mont. 82, ¶ 13, 107 P.3d 481, ¶ 13. A three part test is used to determine if findings of fact are clearly erroneous. First, this Court will review the record to see if the findings are supported by substantial evidence. Second, if the findings are supported by substantial evidence the Court will determine if the trial court has misapprehended the effect of the evidence. Third, if substantial evidence exists and the effect of the evidence has not been misapprehended, this Court may still conclude that a finding of fact is clearly erroneous when, although there is evidence to support it, a review of the record leaves this Court with the definite and firm conviction that a mistake has been made. *Interstate Production Credit v. DeSaye*, 250 Mont. 320, 323, 820 P.2d

9

1285, 1287 (1991) (citations omitted); *In re Mental Health of C.R.C.*, 2004 MT 389, ¶ 11, 325 Mont. 133, ¶ 11, 104 P.3d 1065, ¶ 11.

¶23    A civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection. *Matter of W.M.*, 252 Mont. 225, 229, 828 P.2d 378, 381 (1992), citing *Addington v. Texas*, 441 U.S. 418, 425, 99 S. Ct. 1804, 1809 (1979). As a result, clear and convincing evidence is the standard of proof in a civil commitment proceeding. *W.M.*, 252 Mont. at 229, 828 P.2d at 381. Clear and convincing evidence is not a mere preponderance of evidence but a preponderance of evidence that is definite, clear and convincing. *Matter of J.L.*, 277 Mont. 284, 289, 922 P.2d 459, 462 (1996). Clear and convincing does not mean unanswerable or conclusive evidence or evidence beyond a reasonable doubt. *J.L.*, 277 Mont. at 289, 922 P.2d at 462; *See Matter of Shennum*, 210 Mont. 442, 453, 684 P.2d 1073, 1079 (1984). The three part test announced in *DeSaye* is used to determine if a finding of fact is clearly erroneous in a case where clear and convincing evidence is the standard of proof. *Cartwright v. Equitable Life Assur.*, 276 Mont. 1, 28, 914 P.2d 976, 993 (1996); *In re L.M.A.T.*, 2002 MT 163, ¶ 34, 310 Mont. 422, ¶ 34, 51 P.3d 504, ¶ 34; *In re M.F.B.*, 2001 MT 136, ¶¶ 9-10, 305 Mont. 481, ¶¶ 9-10, 29 P.3d 480, ¶¶ 9-10.

¶24    As an alternative argument, G.M. strenuously asserts that the due process clause of the Montana Constitution, Article II, Section 17, requires this Court to apply the bifurcated standard of proof relating to the involuntary commitment of the mentally ill, in order to find that a person is seriously developmentally disabled. Section 53-21-126(2),

10

MCA (2005), provides "[t]he standard of proof in a hearing held *pursuant to this section* is proof beyond a reasonable doubt with respect to any physical facts or evidence and clear and convincing evidence as to all other matters." (Emphasis added.)

¶25    Under Montana law, clear and convincing evidence is well-established as the standard of proof that must be met in order to commit a person as seriously developmentally disabled. *W.M.*, 252 Mont. at 229, 828 P.2d at 381. In this case, as explained below, we conclude that the District Court's findings of fact that G.M. cannot be safely habilitated in community-based services because of behaviors that pose an imminent risk of serious harm to himself or others is clearly erroneous. Thus, the result of this case would be the same no matter whether the clear and convincing standard or the beyond a reasonable doubt standard is applied. We have repeatedly recognized that courts should avoid constitutional issues whenever it is possible to decide a case without reaching constitutional considerations. *In re S.H.*, 2003 MT 366, ¶ 18, 319 Mont. 90, ¶ 18, 86 P.3d 1027, ¶ 18. Therefore, it is unnecessary to reach the constitutional question raised by G.M., and we decline to do so.

**DISCUSSION**

¶26    *Did the District Court err in finding as matters of fact that G.M. exhibited behaviors that posed an imminent risk of serious harm to himself or others, and that he could not be safely habilitated in the community?*

¶27    A judicial determination that a person has a serious developmental disability is required for recommitment to MDC. Section 53-20-128(8), MCA (2005). A person, in

11

this instance G.M., is seriously developmentally disabled only if the State proves by clear and convincing evidence that he: (a) has a developmental disability; (b) is impaired in cognitive functioning; and (c) cannot be safely and effectively habilitated in community-based services because of behaviors that pose an imminent risk of serious harm to himself or others, requiring recommitment at MDC. Section 53-20-102(15), MCA (2005).

¶28 There is no contest that G.M. meets the first and second requirements for recommitment. The contested issues are (a) whether G.M.'s behaviors pose an imminent risk of serious harm to himself or others and, (b) whether he can be safely and effectively habilitated in community-based services. The questions before this Court are essentially evidentiary: did the District Court err in finding that (a) DPHHS proved by clear and convincing evidence that G.M. poses an imminent risk of serious harm to himself or others and that (b) because of those behaviors G.M. cannot be safely and effectively habilitated in community-based services?

¶29 The evidence considered by the District Court during the hearing consisted of the following: the testimony of the witnesses Crosbie, Dr. Franczak and G.M.'s aunt, I.K.; Dr. Franczak's report; the two packets of incident reports covering incidents from April 2005 to April 2006; and the reports attached to the Petition (QMRP Report, ITP, the Community Placement Profile and a Trend Analysis Report).

¶30 G.M. first contends that DPHHS's evidence was insufficient because it was improperly considered. He argues that Crosbie simply relayed to the court the information contained within the documents with no personal knowledge of G.M.'s

behavior; therefore, the RFST Report and witness testimony were inadmissible hearsay. Yet, G.M. made no hearsay objection in the District Court.

¶31   Counsel for DPHHS did not formally offer any of the reports attached to the Petition into evidence during its case in chief. However, each of the documents attached to the Petition, referred to in ¶ 7 above, had been served upon counsel for G.M. During the hearing, counsel for DPHHS referred to these reports and Crosbie testified about the reports' contents, without objection. Counsel for G.M. also questioned Crosbie from these reports on cross-examination. In his testimony, Dr. Franczak referred to the reports attached to the Petition, and to the other information contained in the District Court file concerning G.M., upon which the reports were based. These reports constitute a substantial basis for his opinion that G.M. did not meet the criteria required for a determination that he was seriously developmentally disabled. In short, both parties were fully aware of all of the information in the reports filed with the District Court, and relied on such information in presenting their case, without objection from the opposing party.

¶32   Each of the documents attached to the Petition and RFST Report, referred to in ¶ 7 above, was served upon counsel for G.M. and the District Court, in compliance with §§ 53-20-125(4), 53-20-128(5), MCA (2005). The QMRP Report initiates the recommitment proceeding and must be attached to the Petition to the District Court, along with the social and placement information relied upon by the RFST in making its determination. Sections 53-20-128(1), (3), (4), (5)(a), MCA (2005). The QMRP Report, the ITP, the Community Placement Profile, and the Trend Analysis Report are the social

13

and placement information relied upon by the RFST. As the dissent correctly points out in ¶ 57, a recommitment hearing is only held if an interested party requests one and, if a hearing is not requested, the district court may rule on the Petition based solely on the attached reports. Sections 53-20-125(9), 53-20-128(6), MCA (2005). Again in ¶ 57, the dissent notes, "civil commitments generally allow the court to view all potentially relevant information in order to determine the treatment and habilitation needs of the respondent," citing *In re Mental Health of L.C.B.*, 253 Mont. 1, 7, 830 P.2d 1299, 1303 (1992); § 53-20-101, MCA (2005).

¶33    G.M. next contends that there was insufficient evidence to recommit him because the incidents of aggression noted in the RFST Report were too stale to be considered evidence that G.M. posed an "imminent" threat of harm to others. G.M. suggests that the DPHHS's evidence was stale because it only presented evidence of G.M.'s behaviors exhibited between December 2004 and January 2006. We disagree. In addition to the reports filed with the District Court before the hearing, which covered the period between December 2004 and January 2006, the parties stipulated to the admission of two packets of incident reports covering the period from April 2005 to April 2006 during the hearing. Although DPHHS might have augmented its evidence by presenting information gathered during the intervening months from April to July 2006, when the hearing was held, failure to do so does not preclude the District Court from considering the evidence that was introduced, and according it proper weight.

¶34    We conclude that the reports attached to the Petition were properly considered by the District Court.

¶35    G.M. also contends that the testimony of Crosbie, the RFST committee chairman, was insufficient because she is not a qualified mental health professional (QMHP) or a licensed psychologist or psychiatrist.  He argues that DPHHS must present a QMHP's expert opinion that a person is seriously developmentally disabled in order to sustain its burden of proof.  Neither the applicable statutes nor the rules of evidence require that a QMHP, a licensed psychiatrist or a licensed psychologist testify as a witness in a developmental disability recommitment proceeding.  *Compare* §§ 53-20-128, 53-20-102(4) & §§ 53-21-102(16), 53-21-126(4), MCA (2005).  We decline to create a new evidentiary standard not contained in the Montana rules of evidence or enacted by the legislature.

¶36    A member of the RFST committee, by statute, may be required to testify regarding the RFST's determination.  Section 53-20-116, MCA (2005).  Crosbie, the chairperson of the RFST, did just that.  Crosbie went on to give the District Court her unqualified opinion that G.M. was seriously developmentally disabled because he was too unstable to live in a community setting without presenting a threat of imminent harm to himself or others.  G.M. made no objection to such opinion.  Then, Crosbie stated the reasons for her opinion—both on direct and cross-examination.  Again, there was no objection to such testimony.  As there was no objection, the District Court was free to consider Crosbie's opinion.  M. R. Evid. 103(a)(1), 701(b), 702, 703.  Thus, the testimony of

15

Crosbie was properly considered by the District Court for what it was worth.

¶37 Lastly G.M. contends that the District Court erred because the entirety of DPHHS's evidence failed to prove that he poses an imminent risk of harm to himself or others and, therefore, cannot be safely and effectively habilitated in community-based services.

¶38 We normally defer to a district court's determination of witness credibility and evidentiary weight. *Interstate Production Credit*, 250 Mont. at 324, 820 P.2d at 1287-88. In this case, however, the District Court made no comment on the credibility of the witnesses and gave no indication of why it resolved the conflicting evidence in this case the way it did.

¶39 If the district court misapprehended the effects of the evidence, or if a review of the record leaves this Court with the definite and firm conviction that a mistake has been committed, there is clear error. *Dept. of State Lands v. Armstrong*, 251 Mont. 235, 241, 824 P.2d 255, 258 (1992); *L.C.B.*, 253 Mont. at 5-6, 830 P.2d at 1302. "Substantial evidence and clearly erroneous are not synonymous and a finding may be set aside, though supported by substantial evidence if found to be clearly erroneous." (Internal quotation omitted). *Interstate Production Credit*, 250 Mont. at 323, 820 P.2d at 1287.

¶40 In its finding of fact #5, the District Court mistakenly states that G.M. was evaluated by the RFST. However, Crosbie stated in her testimony that the RFST does not interview or evaluate a client in person, but relies on the reports described in ¶ 7 above. The District Court also stated that its decision was based on these reports, but

16

made no mention of its consideration of Dr. Franczak's report or testimony attacking the reliability of the ¶ 7 reports.

¶41 A review of the record shows that DPHHS's witness, Crosbie, merely repeated the summary from the RFST's Report that G.M. engaged in thirty incidents of aggression in the past year, ten of them "severe," and five that were "serious." On cross-examination, however, Crosbie could not define how MDC defined the terms "severe" or "serious" used in the reports to describe aggressive incidents. Crosbie only suggested that "severe" behaviors are those that resulted in "actual injuries." Her testimony and the reports themselves are unclear regarding both the number of and severity of the injuries G.M. was alleged to have caused.

¶42 Dr. Franczak noted, and our review of the incident reports confirms, that verbal aggression and door slamming were listed in the reports as "severe" acts, yet no injuries resulted from these incidents. Dr. Franczak testified that petty boyish play was described in the incident reports as serious aggression. This testimony was not contradicted. Franczak also described how the number of G.M.'s allegedly severe, untoward acts were different in the RFST, the QMRP, and G.M.'s psychiatrist's reports. These inconsistencies were not explained by DPHHS, and create further doubt concerning what, if any, objective criteria was used to determine severity of G.M.'s behavior; whether the numbers noted in the summaries relied upon by the District Court accurately reflect G.M.'s aggressive tendencies; and whether the reports are sufficient to disqualify him from being referred to community services.

17

¶43     Dr. Franczak's testimony, along with the actual incident reports that underlie the summaries, reveal that the summaries in the reports do not give an accurate picture of G.M.'s condition. For example, on April 17, it was reported that a client picked up a knife and threw it at G.M., who then picked up the same knife and threw it back at the client. According to the Incident Management Coordinator Review, noted at the bottom of the incident report, this was G.M.'s nineteenth incident since January 1, 2006, and his tenth client-on-client incident. Yet of the ten incidents involving another client, the coordinator noted that G.M. had been the aggressor only once, and he had been the target nine times. Eight of those incidents were with the same other client. Thus, the reports, contrary to the summary in the RFST, indicate that nine times out of ten G.M. was not aggressive but was reacting to aggression by another resident at MDC.

¶44     On the next incident report, dated April 21, it was reported that "[another client] became angry + started yelling at [G.M.], shaking his finger and fists at him, wanting him to fight." According to the Incident Management Coordinator Review section of the report, this was G.M.'s twentieth incident since January 25, 2006, and his eleventh client-on-client incident. Of those eleven, the coordinator noted that this was G.M.'s second incident as an aggressor, and his ninth as a target. Again, contrary to the summary, the facts as reported do not indicate that G.M. was the aggressor.

¶45     The above snapshot of the incident reports lends credence to Dr. Franczak's testimony that MDC's group living environment contributes significantly to G.M.'s behavioral difficulties. The record also indicates that the number of aggressive incidents

18

instigated by G.M. is inflated. Also, our review of the underlying incident reports confirms Dr. Franczak's testimony that in 2006 G.M. was the target of aggression rather than the aggressor in all but one incident. Although the dissent accurately quotes summaries contained in the reports and lists violent incidents from the underlying incident reports, an examination of the incident reports reveals that G.M.'s aggressive behavior is seriously exaggerated. The record also supports Dr. Franczak's uncontested opinion that placing G.M. in a residence with fewer people would ameliorate what aggressive tendencies he exhibits.

¶46 Dr. Franczak's testimony and our review of the underlying incident reports reveal improved behavior and self-control by G.M. in 2006. Dr. Franczak described his analysis of G.M.'s aggressive behavior reported in both the trend analysis report and the incident reports and determined that G.M. had, within the last two years, met assigned objectives for controlling his outbursts. He also noted that no new criteria for returning to the community had been established for G.M. He pointed out that there was no way for G.M. to escape recommitment if he met all his objectives and still was required to reside at MDC. Dr. Franczak stated that the institutional setting is probably responsible for the behaviors that are keeping G.M. in the institution. DPHHS presented no evidence to contradict Dr. Franczak. The decision to keep him at MDC left G.M. in an untenable Catch 22.[1]

---

[1] "Catch-22" is a term coined in Joseph Heller's 1961 novel, Catch-22, describing a situation in which an individual is required to accomplish two actions which are mutually dependent on the other action being completed first. *See In re O.A.W.*, 2007 MT 13, FN 2, 335 Mont. 304, FN 2,

¶47 Nor was Dr Franczak's testimony that living with eleven other men at MDC made G.M. more aggressive contradicted. Likewise, his testimony that individuals with aggressive tendencies worse than those exhibited by G.M. were living successfully in community services went unrebutted. Our own review of the incident reports before the District Court revealed that many reported "level 4" incidents simply involved G.M. predicting and controlling his own mood swings by requesting medication and time alone to calm down. Many of these incidents did not involve any physical or verbal aggression. In at least ten of thirteen reported incidents between January and May 2006, G.M. appears to have been provoked by another resident. Our examination of the reports submitted by DPHHS supports Dr. Franczak's opinion that G.M.'s behavioral problems are triggered by his surroundings.

¶48 The dissent correctly points out in ¶¶ 67 and 68 that the MDC professionals have had more contact with G.M. than Dr. Franczak. For this reason, the dissent posits that the QMRP Report and ITP are more reliable than Franczak's testimony and report. However, no MDC professional who had contact with G.M. testified, and the summaries in the reports are shown to be inconsistent and unreliable. No one appeared to contradict Franczak's analysis of the reports, to contradict the result of his examinations, to disagree with his opinions that G.M. would do much better in a community setting, or to explain why G.M.'s actions would make it unsafe for him to be placed in a community setting.

---

153 P.3d 6, FN 2.

¶49 Although her opinion that G.M. has the ability to be safely habilitated in the community is subject to the weakness pointed out in the dissent, I.K.'s testimony was not objected to and is, therefore, admissible evidence. M. R. Evid. 103(a)(1). I.K.'s personal observation of G.M.'s demeanor and self-control when not in an institutional setting is relevant evidence confirming Dr. Franczak's opinions and tending to prove that G.M. does not pose a risk of harm to himself or others and can be safely habilitated in the community.

¶50 After a thorough review of the record before the District Court, this Court is firmly convinced that a mistake has been made. We determine that the District Court's findings of fact that G.M. posed an imminent risk of serious harm to himself or others, and continues to have such behaviors, which prevent him from being safely and effectively habilitated in currently available community-based services, are clearly erroneous. Thus, the District Court's conclusion of law that G.M. is seriously developmentally disabled as defined in § 53-20-102(15)(c), MCA (2005), is incorrect. *C.R.C.*, ¶ 11.

## CONCLUSION

¶51 The order of the District Court recommitting G.M. to MDC is reversed and remanded with instructions to vacate the recommitment order.

¶52 Pursuant to M. R. App. P. 21(2), the Clerk of this Court shall issue remittitur immediately.

/S/ JOHN WARNER

21

We Concur:

/S/ W. WILLIAM LEAPHART
/S/ BRIAN MORRIS

Justice Jim Rice, dissenting.

¶53    I respectfully dissent from what I believe is an unwise course the Court has chosen to take in this matter.  The Court rejects what it admits is substantial evidence in support of the District Court's finding that G.M. poses an imminent risk of serious harm to himself and others.  Notably, the substantial evidence in support of the District Court's findings is not simply the bare minimum; it is a mountain of evidence.  Nonetheless, the Court pushes aside this voluminous evidence so that it may reach its own conclusion that G.M. does <u>not</u> exhibit behaviors that pose a risk of harm to others.

¶54    The findings of fact overturned by the Court herein involve much more than the usual findings concerning what, when, where or how something happened.  Although the record includes evidence of that nature—including numerous undisputed episodes of violent behavior by G.M. during the review period—the findings, more significantly, also rest upon complex medical or psychological information from which a team of professionals has made assessments about the propensity or risk that G.M. will harm others.  Because the Court cannot deny the evidence of G.M.'s many violent episodes, it instead concludes that this evidence simply does not mean what the District Court and

22

what multiple professionals say it means. The Court thus rejects objective evidence of G.M.'s violence and harm to others in favor of a subjective opinion that the harm will not continue. When it is understood that the decision in this case could jeopardize the physical safety of people, I find the Court's rejection of objective evidence and its second-guessing of conclusions by multiple professionals that the threat of violence still exists to be audacious and disturbing. However, given what I feel is a palpable desire on the part of the Court to reverse this matter, I have attempted to be brief in pointing out its errors.

¶55 The Court properly recites the standards for reviewing challenged findings of fact as clearly erroneous, but omits altogether the standards which define our role in that process. "It is for the trier of fact, and not this Court, to assess the credibility of witnesses and weigh the evidence; we will not second-guess a district court's determinations regarding the strength and weight of conflicting testimony." *St. James Healthcare v. Cole*, 2008 MT 44, ¶ 43, 341 Mont. 368, ¶ 43, 178 P.3d 696, ¶ 43, (quoting *Point Serv. Corp. v. Myers*, 2005 MT 322, ¶ 28, 329 Mont. 502, ¶ 28, 125 P.3d 1107, ¶ 28). Even in *Interstate Prod. Credit Assn. v. Desaye*, 250 Mont. 320, 820 P.2d 1285 (1991), in which we adopted the "definite and firm conviction" prong of the clearly erroneous standard, we nonetheless emphasized:

> Although conflicts may exist in the evidence presented, it is the duty of the trial judge to resolve such conflicts. Due regard is to be given the trial court's ability to judge the credibility of the witnesses. Rule 52(a), M. R. Civ. P. This Court's function is not to substitute its judgment for the trier of fact.

*Interstate Prod. Credit Assn.,* 250 Mont. at 324, 820 P.2d at 1287-88 (citing *Wallace v. Wallace*, 203 Mont. 255, 661 P.2d 455 (1983)). We have likewise repeatedly instructed that "[i]t is well established that in reviewing a district court's findings, this Court does not consider whether the evidence could support a different finding; nor does it substitute its judgment for that of the fact-finder regarding the weight given to the evidence." *In re K.J.B.*, 2007 MT 216, ¶ 23, 339 Mont. 28, ¶ 23, 168 P.3d 629, ¶ 23. These well-established principles by which our review is constrained have not only been silenced for purposes of this case, but the Court has employed the unprecedented assumption that because "the District Court made no comment on the credibility of the witnesses" and "why it resolved the conflicting evidence," the District Court thus abdicated these duties and the Court is now free to undertake them. Simply because the District Court provided no explicit comment on its weight and credibility determinations does not mean it made none. We have never before required a district court to identify the witness testimony which it finds more credible or the evidence to which it gives more weight. However, the Court does today.

¶56 Turning to the content of the Court's analysis, the Court very briefly, in ¶ 32, applies the commitment statutes with regard to the procedure used here and the propriety of the report evidence before the District Court. However, for the remainder of the Opinion, the Court appears contradictory and unsure of itself about these issues, seemingly criticizing DPHHS for not formally offering the reports (¶ 31), but repeatedly noting that G.M. did not object to the reports (¶¶ 30, 31) and that because the documents

24

were attached to the petition and available to G.M., the parties "were fully aware" of the information contained therein (¶ 31), before concluding the reports were "properly considered." (¶ 34). I cannot discern on what basis the Court sustains the evidence, whether statutory, waiver, harmless error or all three. In any event, I would affirm the District Court's consideration of the evidence because it is required by statute.

¶57 Commitment and recommitment of the seriously developmentally disabled is provided by way of a special statutory proceeding which contains its own, specific procedures. Following the filing of a petition for commitment or recommitment, which itself follows the unique procedure of a mandatory assessment of an individual and the filing of reports by multiple professionals, a district court is authorized to commit or recommit an individual upon the basis of the petition and the accompanying reports— *without holding a hearing*. *See* §§ 53-20-125(9), and 53-20-128(6), MCA. Although a hearing will be held if an interested party requests one, the court may otherwise order an individual's commitment or recommitment, including the obligation to enter findings of fact, § 53-20-125(11), MCA, based solely upon the petition and the mandatory reports. Thus, DPHHS's failure to offer the reports into evidence is not at all improper: under the statutes, the reports were already properly before the District Court. The District Court had no choice but to consider them—they are a prerequisite to, and an integral part of, the petition itself, regardless of whose expert relied on them or the "circumstances of this case." Neither is it improper that these reports contained hearsay. By design, the reports are to include the hearsay statements of multiple professionals. Unlike criminal

25

proceedings, where greater evidentiary protections exist, civil commitments generally allow the court to view all potentially relevant information in order to determine the treatment and habilitation needs of the respondent. *In re Mental Health of L.C.B.*, 253 Mont. 1, 7, 830 P.2d 1299, 1303 (1992); § 53-20-101, MCA.

¶58 Consequently, the Court's assessment of Daphne Crosbie's testimony largely misses the point. The Court states that she "could not explain" how terms in the reports were defined, was "unable to refute" the effect of certain environmental pressures on G.M., was "unclear" regarding the injuries inflicted by G.M. and, therefore concludes that her testimony could only be considered "for what it was worth." The point missed is this: *under the statutory process, Crosbie's testimony was not needed in order for the State to meet its burden.* Even without a hearing, and without her testimony, the court was authorized by statute to commit G.M. if the petition and mandatory reports demonstrated that G.M. was seriously developmentally disabled and in need of commitment. Although the testimony of a RFST team member may be required at a hearing, and Crosbie attended the hearing as the statutorily designated chairwoman of the RFST and presented the reports, her testimony was supplemental, given for the purpose of facilitating the presentation of the reports. Thus, the Court's observations that Crosbie added nothing of substance to the information contained in the reports and that she "was the only witness presented" by DPHHS, are largely irrelevant. Under the statute, the State could have chosen to rest its case on the filed reports alone.

¶59 I turn, then, to the evidence. I must initially mention that the specifics of the evidence about G.M.'s behavior are disturbing. Although the Court is forced to acknowledge that "treatment has not eliminated all of G.M.'s behavioral difficulties, specifically physical outbursts that are sometimes violent" (¶ 6), this statement is a significant understatement. The documents about G.M. before the District Court included incident reports covering April 2005 to April 2006, the RFST Report, a QMRP Report, an Individual Treatment Plan (ITP), a Community Placement Profile, and a Trend Analysis Report.

¶60 The QMRP report stated as follows:

> [G.M.] gesturally and verbally threatens others. He causes others to be disruptive by name calling, goading or jeering at them. He targets specific peers, making fun of, taunting or teasing them. He will order others around and demand to get his own way. He will bother others by getting too close, talking to [sic] loud or attempt to touch or hug them. *[G.M.] can be very aggressive he [sic] will hit, slap, kick, head butt and/or bite others. He will scream at others while in conflict with them. He will throw objects, slam doors and destroy furnishing. He will become aggressive as a reaction to change. [G.M.] has extreme mood swings as evident by being happy at one moment, and then become extremely depressed or aggressive these [sic] mood swings often occur <u>without apparent environmental causes</u>.*

(Emphasis added.) Concerning the safety of others, the QMRP report stated that G.M. presented "a high risk for individuals" whom he targets and explained that "[p]eers express fear of [G.M.] In order to protect targeted clients, we have had to move them to other units and restrict their visits to the area where [G.M.] resides." G.M. had to be sent to a secure unit twice after kicking another client, punching him in the mouth and cracking his tooth. This client had to be moved elsewhere to avoid contact with G.M.

27

The report continues: "If G.M. has a physical outburst it will take 4 trained staff to control the situation. Behaviors can happen quickly and without warning. . . . Staff have been injured requiring medical attention." The report concluded that the trained staff at MDC were the only known providers capable of dealing with G.M.'s behaviors because G.M.'s "behaviors present a *high risk of imminent danger to others* . . . ." (Emphasis added.)

¶61 The RFST's recommendation for recommitment also left no doubt as to the objectivity of, and basis for, that recommendation. The RFST recommended recommitment because G.M. engaged in thirty incidents of physical aggression over the course of the last year, often without warning, and consistently injuring other clients and staff. The RFST Report acknowledged that while G.M.'s "extensive history of behavioral difficulties" primarily included physical aggression, G.M. had thirty-six incidents of environmental disruptions and two incidents of inappropriate sexual behavior. The report also emphasized that MDC's staff was familiar with G.M.'s behaviors and could often intervene and prevent aggression, but that other times his aggression was without obvious cause and simply the result of a sudden mood swing. The RFST *unanimously* determined that G.M. should not be referred to community-based services.

¶62 The ITP report included excerpts from a thorough psychological evaluation of G.M. The ITP observed that the routine and structure provided when G.M. is isolated in a secure unit help G.M. to stay calm: "uncertainty is one instigating factor that has been

repeatedly shown to be associated with episodes of aggression." It offered the following about G.M.'s behaviors:

> On one occasion, he became agitated due to his brother not calling when [G.M.] thought he would. He verbally threatened a female staff then ran at her and attempted to hit her; he eventually was able to kick her and was placed in the observation room as a result of continued aggressive behaviors. The other incident began when [G.M.] was told he was "over the limit" of fluids for the day . . . . [G.M.] threw his glasses at staff and attempted to hit, kick, and bite them. He was redirected with body positioning. [G.M.] hit the window in the door and was restrained . . . to prevent further aggressive behaviors.

Like the RFST, the ITP team also *unanimously* agreed that G.M. was not ready for community placement. These individuals had interacted with G.M. on a regular basis and had firsthand knowledge of G.M. and the incidents in which he was involved, *unlike Dr. Franczak*, who met with G.M. on only two occasions, separated by a period of two years, and reviewed the records compiled by those individuals familiar with G.M.'s behavior and its severity. Contrary to her testimony at G.M.'s hearing which the Court so favorably draws upon, G.M.'s aunt *agreed* at the ITP meeting that he was *not* ready for community placement because his behaviors were not under control and he presented a high risk to others.

¶63 Incident reports for G.M. covering the period from April 1, 2005 until April 29, 2006, covering incidents which had occurred since G.M.'s last recommitment, included the following: G.M. was restrained for throwing a chair at a staff member, then approaching him swinging; for kicking a client in the face; for assaulting staff; for attacking another client and trying to kick him; for jumping up and down on a client's

29

head, then attacking staff who attempted to intervene; for punching a client in the mouth and breaking a tooth; for punching another client in the mouth; for punching another client in the mouth and kicking him; for hitting a client and throwing videotapes at him; for throwing his glasses at staff; for punching and breaking a window with his fist and attacking staff; for trying again to attack staff; for again throwing his glasses, punching a window, and attempting to punch, kick, bite, and head-butt staff. Then, between January and April 2006—a period not covered by the QMRP or RFST report—many more such incident reports were filed concerning G.M. that he had instigated.

¶64    While the Court chooses to emphasize reported incidents in 2006 which were instigated by another resident at MDC (¶¶ 43-44), that does not dismiss the many incidents which occurred throughout 2005 and 2006 in which G.M. *was* the aggressor. For example, throughout the fall of 2005, specific incidents were reported in which G.M. punched another resident in the back after being teased; became upset after an awards presentation, punched walls, and slammed doors; and entered another patient's room unprovoked, called him an "ass hole," and punched out the resident's top front tooth. These incidents are not included within the Court's "snapshot" discussion of G.M.'s problems, but were properly considered by the District Court.

¶65    Likewise, and contrary to the Court's intimation, G.M.'s aggressive behavior in the spring of 2006 was definitely not limited to times when another resident provoked him. For example, on March 31, 2006, G.M. was setting the table for lunch in the dining room. As another MDC resident walked through the door from the patio, G.M. slammed

30

the door, nearly injuring the other resident. The other resident struck G.M. on the left shoulder, and G.M. responded by striking the resident and cursing at him. This was not the only incident in which G.M. became aggressive that spring. On April 15, 2006, after MDC staff had asked G.M. to wait before calling his aunt on the phone, G.M. became upset, walked to the end of the hall, and hit the wall with his hand, injuring himself. I believe this evidence shows that the Court's assessment of G.M.'s conditions is simply not a credible one, and the District Court's assessment should be accepted.

¶66 The Court emphasizes that "[N]o one appeared to contradict Franczak's analysis of the reports, to contradict the result of his examinations, to disagree with his opinions . . ., or to explain why G.M.'s actions would make it unsafe for him to be placed in a community setting." ¶ 48. But contradicting Dr. Franczak's testimony is exactly what the QMRP and RFST accomplish: they represent reliable, statutorily-admitted evidence which rebuts Dr. Franczak's opinion that G.M. is not a risk to others and not seriously developmentally disabled. Crosbie's testimony also contradicted Dr. Franczak's conclusion. Considering the clear and voluminous nature of the evidence of G.M.'s behavior set forth in the reports, I cannot reach any conclusion but that Dr. Franczak's opinion was not credible. However, my opinion is beside the point. The critical matter is that the District Court clearly did not find his opinion credible either.

¶67 The District Court did not err "in finding as matters of fact that G.M. exhibited behaviors that posed an imminent risk of bodily harm" to himself and others. He clearly did so repeatedly during the review period. The District Court did not "misapprehend[]

the effects of the evidence when it is considered in its entirety." The entirety of the record provides more than ample objective evidence of the risk G.M. poses to himself and others. The Court, by professing a "definite and firm conviction" of error in the face of this record, has substituted itself as the fact finder and as the trial judge, deciding weight and credibility on complex issues of mental processes and the impact of those on future behavior. In doing so, it rejects the clear objective evidence of G.M.'s violence and multiple opinions of his continuing risk to others in favor of an expert's—one who was not a caretaker to G.M. and saw him twice—subjective opinion that the future will be altogether different than the past.

¶68 Only by re-weighing the evidence—by discarding the above evidence and embracing the testimony of Dr. Franczak—can the Court arrive at its decision today. Although it purports to reject G.M.'s argument that the State must call a QMHP or a licensed psychologist to opine that a person is seriously developmentally disabled, the holding repeatedly emphasizes Dr. Franczak's live testimony and will, as a practical matter, require just that, because it today rejects the collective wisdom set forth in the mandatory reports in favor of one expert who testified in person. In so doing, the Court strikes a blow to the advantages of the current statutory system and to legislative purpose—making available extensive expert advice about an individual, developed in consultation with many others, without requiring practitioners to absent themselves from providing care within hospitals and treatment centers in order to testify at every commitment hearing.

¶69    The evidence in this case did not convince the District Court that G.M. had, in fact, progressed sufficiently to be released to a community placement.  There was far more than enough evidence to justify the findings entered by the District Court.  Though G.M. attacks the "bureaucrats" and the institution in which he resides, it is not our duty to attempt to remake the system G.M. asserts is flawed.  Indeed, a constitutional challenge to the statutory system of commitment has not been made in this case.  If we stayed within our proper duty, we would affirm.

¶70    As the State has correctly argued, the evidence demonstrates clearly that the District Court did not make a mistake in ordering G.M. to be one of approximately sixty developmentally disabled individuals to be committed to an institution in this state, instead of being released to join the over 5,000 such individuals who are treated within community settings.  I agree, and therefore dissent.

/S/ JIM RICE

Justice Patricia O. Cotter joins the dissenting opinion of Justice Rice.

/S/ PATRICIA COTTER

Chief Justice Karla M. Gray, specially concurring.

¶71    I concur in the Court's resolution of this case, but in only limited portions of the Opinion.  I write separately to address our clearly erroneous standard of review of a district court's findings of fact and *In re Mental Health of L.C.B.*

33

¶72    The genesis of the clearly erroneous test for trial court findings is M.R.Civ.P. 52(a), which provides that "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."  In *Interstate Production Credit v. DeSaye*, 250 Mont. 320, 820 P.2d 1285 (1991), we adopted the 3-part clearly erroneous test for reviewing trial court findings in civil cases. Since that time, we have not—to my knowledge—considered changing it, although we are always free to do so.

¶73    In *DeSaye*, we also clarified the difference between the "substantial credible evidence" standard necessary to support a civil jury verdict and the "clearly erroneous" test used for trial court findings.  We observed that substantial evidence is necessary to support both a jury verdict and a trial court's finding of fact, and neither test can be met without substantial evidence.  As we stated, however, the converse is not true: a trial court finding supported by substantial evidence still can be clearly erroneous if the trial court misapprehended the effect of the evidence or—even without such misapprehension—if this Court is left with the definite and firm conviction that a mistake has been committed.  *DeSaye*, 250 Mont. at 322-23, 820 P.2d at 1287.  By its terms, the 3-part clearly erroneous test is much broader—and gives this Court more room to set aside a district court's finding of fact—than the substantial evidence standard relating to a jury verdict.  We have applied the second or third part of the clearly erroneous test to set aside a district court's finding very rarely—and properly so.  *See e.g. Leisz v. Avista*

*Corp.*, 2007 MT 347, ¶ 34, 340 Mont. 294, ¶ 34, 174 P.3d 481, ¶ 34; *Beaver v. DNRC*, 2003 MT 287, ¶ 82, 318 Mont. 35, ¶ 82, 78 P.3d 857, ¶ 82. It is my view, however, that this case warrants such application, and the clearly erroneous test is broad enough to authorize our resolution here.

¶74 My second point pertains to *In re Mental Health of L.C.B.* There, the appellant argued the "criminal law exclusionary rule" should bar certain *testimony* regarding his behavior during his allegedly illegal detention. Noting "involuntary commitment hearing proceedings are civil in nature," we rejected the argument on grounds that "[s]uppressing relevant *evidence* in commitment proceedings would defeat the purpose of the proceeding, which is to secure the appropriate treatment[.]" *In re Mental Health of L.C.B.*, 253 Mont. at 7, 830 P.2d at 1303 (citations omitted) (emphasis added). Contrary to the Court's statement in ¶ 32 and the Dissent's statement in ¶ 57, our discussion of *evidence* and *testimony* did not include the adoption of an inconceivably broad rule that a district court in an involuntary commitment proceeding may view all potentially relevant information in the universe, as opposed to properly admitted evidence. I strongly disagree with the Court's misstatement of *In re Mental Health of L.C.B.* to that effect.

¶75 I concur in the result the Court reaches.

/S/ KARLA M. GRAY

Justice James C. Nelson joins in the foregoing specially concurring opinion of Chief Justice Gray.

/S/ JAMES C. NELSON

35