DA 06-0738

IN THE SUPREME COURT OF THE STATE OF MONTANA

2008 MT 266

IN THE MATTER OF T.P.,

      Respondent and Appellant.

APPEAL FROM:    District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. CDI 2006-04
Honorable Thomas C. Honzel, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Andree M. Larose (argued) and Thomas A. Dooling, Disability Rights Montana, Inc., Helena, Montana

      For Appellee:

          Hon. Mike McGrath, Attorney General; Sheri Sprigg, Assistant Attorney General (argued), Helena, Montana

          Leo Gallagher, Lewis & Clark County Attorney; K. Paul Stahl, Deputy County Attorney, Helena, Montana

Argued and Submitted: September 19, 2007

Decided: August 4, 2008

Filed:

_____
                   Clerk
Justice John Warner delivered the Opinion of the Court.

¶1     T.P. appeals from the order entered by the First Judicial District Court, Lewis and Clark County, recommitting her to the Montana Developmental Center (MDC).

¶2     T.P. presents numerous issues and sub-issues pertaining to the appropriate standard of proof. However, as the Court has determined that the dispositive issue on appeal is whether the record contains sufficient evidence to sustain the District Court's conclusion of law that T.P. is seriously developmentally disabled, we address only this issue.

¶3     T.P. is a developmentally disabled woman. In January 2006, the State of Montana's Department of Public Health and Human Services (DPHHS) petitioned for the involuntary commitment of T.P. to MDC. DPHHS and T.P. stipulated to her commitment to MDC for a period not to exceed ninety days. Based on this stipulation, on February 1, 2006, the District Court entered an order finding that T.P. had behaviors posing an imminent risk of serious harm to herself or others and that she could not be safely and effectively habilitated in community-based services at that time. The court concluded that T.P. was seriously developmentally disabled, and she was committed to MDC. Under §§ 53-20-125(1)(b), 53-20-125(8), MCA (2005), the "seriously developmentally disabled" determination is a prerequisite for committing or recommitting a person to MDC.

¶4     On May 1, 2006, DPHHS petitioned for T.P.'s recommitment. The petition stated that Larry LeRoux, the Qualified Mental Retardation Professional (QMRP) assigned to T.P., had requested the petition through QMRP Bobbie Janacaro (Janacaro). The petition alleged, among other things, that T.P. continued to be seriously developmentally disabled and in need of commitment.

¶5    Attached to the petition was an individual treatment plan from early March 2006 (March Plan) and a QMRP report written by Janacaro, dated April 27, 2006 (Janacaro's Report). The Janacaro Report stated T.P. "is currently not able [sic] engaging in behaviors that are harmful to herself due to the limitations/supervision provided in her current living environment, along with medication adjustments." Under the heading "[d]escribe behaviors that pose an imminent risk of serious harm to others," the report stated "[n]one at this time due to environment. [sic] (structure and supervision)." Under the heading of "potential for risk to self," it stated "[n]one at this time. However, potential is high if given opportunity." Under the heading of potential for risk to others, the report stated "[p]otential is high if given opportunity."

¶6    As required by statute, the District Court referred the petition to the Residential Facility Screening Team (RFST). The RFST determined T.P. was seriously developmentally disabled and recommended her recommitment. The RFST Report stated that T.P. had forty-one incidents of verbal aggression, thirty-four incidents of environmental disruption, thirteen incidents of physical aggression and four incidents of deliberate self-harm while at MDC. The RFST Report was devoid of any description of the listed incidents.

¶7    The District Court held a hearing on the petition for T.P.'s recommitment on September 6, 2006. Daphne Crosbie, DPHHS representative and RFST chairwoman, was the sole witness in support of T.P.'s recommitment. Crosbie testified that "the document [the RFST] looked at was the . . . treatment plan dated 5/2/06" (May Plan). This May Plan had not been filed with the petition in District Court, nor was it admitted into evidence at the

3

hearing. Thus, the District Court never saw the May Plan. Crosbie herself could not provide any information regarding the reported incidents involving T.P., other than a statement that the incidents all occurred in February, the month T.P. was committed.

¶8    T.P. was not present at the hearing. An advocacy specialist with the Montana Advocacy Program testified in opposition to T.P.'s recommitment. Her testimony is not pertinent to the issue we address here.

¶9    On October 2, 2006, the District Court entered its order recommitting T.P. for one year or until a suitable placement in a less restrictive environment could be obtained. Among other things, it determined T.P. has behaviors that pose an imminent risk of serious harm to herself or others and is seriously developmentally disabled. T.P. appeals.

¶10   "We review a district court's determination in a civil commitment case to determine whether the court's findings of fact are clearly erroneous and its conclusions of law are correct." *In re T.S.D.*, 2005 MT 35, ¶ 13, 326 Mont. 82, ¶ 13, 107 P.3d 481, ¶ 13. To determine whether a finding is clearly erroneous, we apply the following three-part test: (1) we review the record to see if the findings are supported by substantial evidence; (2) if the findings are supported by substantial evidence, we determine if the trial court misapprehended the effect of the evidence; (3) if substantial evidence exists and the effect of the evidence was not misapprehended, we may determine that a finding is "clearly erroneous" when, although there is evidence to support it, a review of the record leaves us with the definite and firm conviction that a mistake was made. *See In re G.M.*, 2008 MT

200, ¶ 22, 344 Mont. 87, ¶ 22, 186 P.3d 229, ¶ 22; *In re T.S.D.*, ¶ 13; *Matter of Mental Health of L.C.B.*, 253 Mont. 1, 6, 830 P.2d 1299, 1302 (1992).

¶11  A district court may recommit a person to MDC only if the court determines he or she continues to be "seriously developmentally disabled" and in need of continued commitment to MDC. Section 53-20-128(8), MCA (2005). "Seriously developmentally disabled" means a person who "has a developmental disability," is "impaired in cognitive functioning," and cannot be safely and effectively habilitated in community-based services because of "behaviors that pose an imminent risk of serious harm to self or others[.]" Section 53-20-102(15), MCA (2005).

¶12  No dispute exists that T.P. has a developmental disability and is impaired in her cognitive functioning. T.P. challenges the District Court's finding that she could not be safely or effectively habilitated in community-based services because she has behaviors posing an imminent risk of serious harm to herself or others. T.P. asserts the evidence does not support this finding and maintains that general statements regarding "physical aggression" and "deliberate self harm," without more, do not support a finding of actual or potential serious harm. We agree.

¶13  As set forth above, the first inquiry under the clearly erroneous test is whether substantial evidence supports a challenged finding. *See In re T.S.D.*, ¶ 13; *In re Mental Health of L.C.B.*, 253 Mont. at 6, 830 P.2d at 1302. The District Court did not set forth in its findings of fact what evidence it considered in reaching the ultimate question of whether T.P. was seriously developmentally disabled. Nor did the District Court file an opinion or

5

memorandum of decision explaining how it reached its decision that T.P. was seriously developmentally disabled.

¶14 This Court has recently concluded that, given the district court's role in civil commitment proceedings, the district court may consider the contents of reports filed according to statute. As noted in *In re G.M.*, ¶ 32, the district court must view all potentially relevant information in order to determine the treatment and habilitation needs of the respondent, citing *In re Mental Health of L.C.B.*, 253 Mont. at 7, 830 P.2d at 1303; § 53-20-101, MCA (2005). Further, § 53-20-128(6), MCA, grants the court authority to order a recommitment based on the filed reports when the petitioner does not request a hearing. Although the March Plan, Janacaro's Report, and the RFST Report were not formally offered into evidence, these documents were filed with the District Court before the hearing as required by statute and were available to the court and both parties. Neither party objected to the court's considering them. These reports provided relevant information bearing on the issue at hand. Therefore, these documents could be considered by the District Court in making its findings of fact. *In re G.M.*, ¶ 34.

¶15 Nevertheless, after a review of the reports and the testimony at the hearing, we conclude that DPHHS did not present to the District Court substantial evidence that T.P. posed an imminent risk of serious harm to herself or others. The March Plan contained mostly T.P.'s history and one sentence stating that "[s]ince her admittance to MDC [T.P.] has engaged in behaviors of verbal and physical aggression, and property destruction." Janacaro's Report revealed that T.P. had not engaged in behaviors that posed an imminent

6

risk of serious harm to herself or others. As for her potential to cause serious harm to others, Janacaro reported "[p]otential is high if given opportunity." This statement alone does not constitute substantial evidence to recommit a person to a residential facility. The incident reports introduced into evidence at the hearing did not demonstrate T.P.'s harmfulness to herself or others. These reports combined do not constitute substantial evidence.

¶16 Crosbie merely stated that "as of that time when [T.P.'s treatment team] looked at her in May, she had—then had 13 incidences of physical aggression" and four incidents of deliberate self-harm at MDC. Crosbie conceded that the RFST does not have operational definitions of the terms "physical aggression" or "serious harm." The substance of Crosbie's testimony was that she herself did not know what T.P. had done, and the RFST members had assumed she had some physical contact with someone. Crosbie suggested that the RFST merely accepted, without examination of the facts, the conclusions of T.P.'s treatment planning team set forth in the May Plan. This cursory review is not sufficient to recommit a person to MDC, particularly when the supporting documentation is not all before the court and what is before the court is unsubstantial.

¶17 The testimony at the hearing did not explain how T.P.'s problems would disqualify her from a community placement. The reports before the District Court indicate that structure, supervision and medication provided to T.P. at MDC from late February to September 2006 assisted her to the point where she did not exhibit behaviors that posed imminent risk of serious harm to herself or others. No evidence was presented that community-based services lack structure, supervision and medication. Thus, neither the

7

District Court nor this Court has any evidence upon which to base a finding of fact that T.P.'s incidents of aggression or harm make her a threat to herself or anyone who lives with her in a community setting.

¶18    The District Court's finding of fact that T.P. posed an imminent risk of serious harm to herself or others, such that she could not be habilitated in community-based services, is clearly erroneous as it is not supported by substantial evidence. *In re T.S.D.*, ¶ 13; *In re Mental Health of L.C.B.*, 253 Mont. at 6, 830 P.2d at 1302. The District Court erred in recommitting T.P. to MDC as a seriously developmentally disabled person.

¶19    We reverse and remand with instructions to vacate the recommitment order.

¶20    Pursuant to M. R. App. P. 21(2), the Clerk of this Court shall issue remittitur immediately.


                                                    /S/ JOHN WARNER



We Concur:

/S/ PATRICIA COTTER
/S/ W. WILLIAM LEAPHART
/S/ JIM RICE
/S/ BRIAN MORRIS



Justice James C. Nelson concurs.

¶21    I joined Chief Justice Gray's concurring Opinion in *In re G.M.,* 2008 MT 200, 344 Mont. 87, 186 P.3d 229, and I join her concurring Opinion in the instant case. I have grave

concerns about any statutory scheme that allows the State to deprive a person of his or her liberty and dignity on the basis of oral and written hearsay; on documents not in evidence; on the testimony of persons who have no direct knowledge of matters and incidents about which they are testifying; on reports which contain undefined, confusing, inconsistently used, and purely subjective terminology; and where the person who is the subject of the proceeding may not even be present. That the persons who are subjected to this statutory scheme are among the least able to defend themselves—not to mention, for far too long, the least defended—exacerbates my anxiety.

¶22 I urge the Legislature to revisit the entirety of Title 53, chapter 20, and to enact appropriate amendments and revisions to this statutory scheme so as to insure procedural and substantive due process to developmentally disabled persons who are involuntarily committed and recommitted. Indeed, it is fair to point out that we would not permit persons accused of crimes to be charged, tried and imprisoned on the sorts of procedures and evidence which the State routinely uses to commit and recommit persons whose only "offense" is their neurologically disabling condition. Developmentally disabled persons are entitled to no less protection of their fundamental constitutional rights to due process of law, to individual dignity, and to seek safety, health and happiness[1] than are persons who violate society's criminal laws. Our paternalistic attitude toward and manner of dealing with developmentally disabled persons simply must change.

---

1 These rights are protected under Article II, Sections 17, 4 and 3, respectively, of the Montana Constitution.

¶23    That said, unless and until such a legislative reexamination of Title 53, chapter 20, occurs, it will be up to defense counsel to aggressively challenge these statutes and the processes and procedures by which developmentally disabled persons are involuntarily institutionalized.

¶24    With these observations, I concur in Chief Justice Gray's Concurrence.


/S/ JAMES C. NELSON


Chief Justice Karla M. Gray joins in the Concurrence of Justice James C. Nelson.


/S/ KARLA M. GRAY

10

Chief Justice Karla M. Gray, specially concurring.

¶25    I concur in the Court's resolution of this case, but only in limited portions of the Opinion.  In my concurring opinion in *G.M.*, ¶ 74 (Gray, C.J., concurring), I observed that—contrary to certain statements by the Court and the Dissent in that case—*Mental Health of L.C.B.* addressed the inapplicability of the "criminal law exclusionary rule" to testimony and evidence admitted at a hearing, and did not state that a district court in an involuntary commitment proceeding may view all potentially relevant information in the universe.  Here, I write separately to expand on my views that certain evidentiary requirements apply in a commitment or recommitment hearing, documents merely filed with a clerk of court are not "evidence" of their contents in the context of such a hearing, and a district court may not properly base its findings on filed documents that are not admitted into evidence at a hearing.

¶26    The first inquiry under the clearly erroneous test is whether substantial evidence supports a challenged finding.  *See In re T.S.D.*, ¶ 13; *Mental Health of L.C.B.*, 253 Mont. at 6, 830 P.2d at 1302.  Section 26-1-101(2), MCA, defines "evidence" as "the means of ascertaining in a judicial proceeding the truth respecting a question of fact, including but not limited to witness testimony, writings, physical objects, or other things presented to the senses."  The initial burden of producing evidence as to a particular fact is on the party who would be defeated if no evidence were given on either side.  Section 26-1-401, MCA.  Thus, the party asserting a claim for relief—here, the State— bears the burden of producing evidence in support of its claim that T.P. should be recommitted.  *See Envir. Info. Center v. Dep. of Envir. Qual.*, 2005 MT 96, ¶ 14, 326 Mont. 502, ¶ 14, 112 P.3d 964, ¶ 14 (citation omitted).  Similarly, the burdens of persuasion and proof are on the party—here, the

State—asserting the facts essential to the relief being claimed. *See* §§ 26-1-402 and -403, MCA. "Proof" is the establishment of a fact by evidence. Section 26-1-101(4), MCA.

¶27 With certain exceptions not relevant here, the Montana Rules of Evidence apply to all proceedings in Montana courts. M. R. Evid. 101(a); *see also* §§ 53-20-112(1) and 53-21-115(7), MCA (2005). The Montana Rules of Evidence address such matters as relevance, hearsay, authentication and identification, and the contents of writings and recordings. *See* M. R. Evid. 401-403 and 801-1008. The court determines all preliminary questions concerning the admissibility of evidence. M. R. Evid. 104(a).

¶28 *Mental Health of L.C.B.* cited to a prior involuntary commitment case relying on § 53-20-101(1), MCA, and the Court likewise cites to that statute in ¶ 14. *See Mental Health of L.C.B.*, 253 Mont. at 7, 830 P.2d at 1303. Section 53-20-101(1), MCA, which has not changed substantively since its enactment in 1975, reads "[t]he purpose of this part is to: (1) secure for each person who may be a person with developmental disabilities such treatment and habilitation as will be suited to the needs of the person and to assure that such treatment and habilitation are skillfully and humanely administered with full respect for the person's dignity and personal integrity." I have no quarrel with our reliance in *Mental Health of L.C.B.* on § 53-20-101(1), MCA, in distinguishing involuntary commitment cases from criminal cases for purposes of determining the applicability of the exclusionary rule. I adamantly disagree, however, with the Court's apparent reasoning in ¶ 14 that the statutory subsection has any bearing on whether, under the clearly erroneous test which the Court purports to apply, the *evidence* is sufficient to support a trial court's findings. *In re T.S.D.*, ¶ 13; *Mental Health of L.C.B.*, 253 Mont. at 6, 830 P.2d at 1302.

¶29 Further, while § 53-20-128(6), MCA (2005), contemplates the recommitment of a person

without a hearing if no hearing is requested or held, the fact is that a hearing actually occurred here. In the context of a hearing where the Montana Rules of Evidence apply, as discussed above, I cannot conceive that the Legislature intended that a person could be involuntarily committed or recommitted to the MDC for a full year after a hearing at which he or she had no meaningful opportunity to challenge the evidentiary bases for the allegations supporting the petition for commitment or recommitment. Stated differently, my view is that an involuntary commitment hearing is not merely a procedural nicety, but the only chance for a person facing a loss of liberty to put the State to its proof.

¶30 Based on the foregoing, I agree with the Court's observations in ¶¶ 7 and 16 that, the May Plan having not been offered into evidence nor even filed, Crosbie's testimony regarding the May Plan was insufficient to support findings necessary for T.P.'s recommitment. I disagree with the Court's reasoning that the District Court could have properly based its findings on the March Plan, Janacaro's Report and the RFST Report, which were neither introduced nor admitted into evidence.

¶31 I concur in the Court's determination that the District Court erred in finding T.P. "seriously developmentally disabled" and in the disposition of this case.

/S/ KARLA M. GRAY

Justice James C. Nelson joins in the foregoing special concurrence of Chief Justice Karla M. Gray.

/S/ JAMES C. NELSON

13